PEPPETT *v.* MICHIGAN CENTRAL RAILROAD CO.

1. RAILROADS — DEFECTIVE ENGINE — INSPECTION BY ENGINEER — ASSUMPTION OF RISK.

A railroad engineer, whose duty it was to inspect his engine before going out on a trip, and who made such inspection, but reported nothing wrong, assumed the risk resulting from an alleged worn center casting in the engine, where the wearing, if any, was clearly discernible.

2. SAME — DERAILMENT — CONDITION OF RAIL — EVIDENCE.

A locomotive jumped the track at a curve, causing the engineer's death. In an action by the administrator against the company, the plaintiff sought to show that the rail was defective at the point where the engine left the track, and introduced two witnesses, who testified that they had noticed certain marks on the rail after the accident, and had observed that the rail was considerably worn; that, in their opinion, the rail was subsequently changed, they having looked for the

marks previously noticed, and been unable to find them.   On defendant's behalf, a disinterested witness, who lived in the vicinity, testified that, at the time of the accident, he made a mark with a chisel on the flange of the rail at the point where the wheels left the track, and that the same rail, with his mark upon it, was in place 10 days before the trial.   Four witnesses, including defendant's road-master, assistant track-master, and local section man, testified positively that the rail had not been changed, and the state mechanical engineer and other experts testified that they had seen the rail in question, and that it was in no respect defective.   *Held,* that the court was right in refusing to submit to the jury the question whether the rail was defective and had been removed.

3. SAME—NEGLIGENCE—ACCIDENT—CAUSAL CONNECTION.
  The representatives of a locomotive engineer, who was killed in a derailment, must show some causal connection between alleged defects in the engine and the accident, to warrant a recovery against the company because of its claimed negligence in failing to remedy the defects.

4. TRIAL—REOPENING CASE—REFUSAL TO ALLOW—EXPERT WITNESSES.
  It was a proper exercise of the court's discretion to refuse to permit the plaintiff, in an action for alleged negligent killing, to reopen his case, after several expert witnesses called for defendant had been discharged and had returned to their homes at some distance, for the purpose of introducing an expert to give testimony in support of the main case.

  MONTGOMERY, J., dissenting.

Error to Jackson; Peck, J.   Submitted June 17, 1898. Decided April 18, 1899.

Case by Sarah F. Peppett, administratrix of the estate of George Peppett, deceased, against the Michigan Central Railroad Company, for the alleged negligent killing of plaintiff's intestate.   From a judgment for defendant on verdict directed by the court, plaintiff brings error.   Affirmed.

Plaintiff's counsel state her case as follows:

"George Peppett, the plaintiff's intestate, was, on the

13th day of September, 1895, a locomotive engineer in the defendant's employ. He was running passenger engine No. 507, pulling the train known as the 'North Shore Limited,' one of the fastest trains on the road. He left the city of Jackson at 10:30 o'clock in the morning of September 13th, and was due at Marshall, 32 miles distant, at 11:20. The train was not scheduled to stop at Marshall, and, while running around a curve inside the city limits, the engine left the track at a point a few feet west of Maple street. At the time of the derailment the train was moving at the rate of about 35 miles an hour. After leaving the rails, the engine ran on the ties for about 350 feet, when she left the ties, and, running in a southerly direction across the right of way, tipped over in Marshall avenue, pinning the engineer under the cab, and causing his death. The track between Maple street and Marshall avenue runs east and west, in a curve of 2° 15′. The point where the truck wheels first left the rails is in the sharpest part of the curve, and the south rail formed the outside of the curve."

The declaration contains eight counts, alleging several grounds of negligence. Two only are now insisted upon, viz., defective center castings and a defective rail. The able circuit judge, in directing a verdict, gave his reasons in the following language upon the two grounds now insisted upon:

"The plaintiff claims that the evidence would justify the jury in finding the following conditions as the basis of the alleged negligence: That the center castings, male and female, of the engine in question, where they connect together between the engine and truck, had become worn so as to be elliptical or oblong instead of round, as they should have been, and that the outer rail where the derailment occurred was worn.

"In disposing of the case by peremptory instructions to the jury, it is the duty of the court to adopt that view of the evidence most favorable to the plaintiff; to consider that the jury might believe the testimony which makes most in the plaintiff's favor, and disbelieve all that which would make or tend to sustain the position of the defendant. Taking that view of the case, it must be said that the jury might be justified in finding that the following conditions existed: *First.* That the center castings were

worn so as to become oblong or elliptical where they came together. *Second.* That the center castings were not jacked up for inspection, or inspected while separated, except when the engine was jacked up for some other purpose than inspection; that there was no inspection of them except when the engine was jacked up and the parts were separated, except such inspection as the engineer might make when he took the engine out for his trip or returned with it.

"Assuming these conditions to exist, we are confronted by the next element of the plaintiff's case, which is this: Would the jury be justified in finding, from the evidence, that any or all of these conditions constituted negligence on the part of the defendant?

" Now, whether the condition of the center castings and of the worn rail was a negligent condition—a condition which the defendant allowed in violation of its duty—is to be determined from the evidence in the case. At the threshold of that inquiry is presented the question: What is proper evidence that the center castings or worn rail were in an unsafe and dangerous condition?

"My views with reference to this question, as applicable to both the worn rail and the center castings, will be sufficiently explained by a reference to the outer rail—the worn rail—only. It is certain that every railroad rail commences to wear as soon as its use for railroad purposes begins, and continues to wear as long as that use continues. It might be possible that any one could tell that a rail just put down was not so worn as to be unsafe and dangerous, or that any one could say that a rail nearly worn out, or just hanging together, was unsafe and dangerous; but, in my judgment, no person having only the common intelligence of mankind could say, so as to make it evidence, that a rail in the condition limited on the one hand by the testimony of the plaintiff, and on the other by the testimony of the defendant, was unsafe and dangerous or not. I know I could not; I am confident that as intelligent jurors as you are could not; nor could any man, however intelligent he may be in a general way, tell, with any great certainty or confidence in his judgment. I am, therefore, convinced that information upon that subject—evidence which should actuate us in reaching conclusions—can only be sought from people who do know it, who have some unusual intelligence and judgment upon the subject, by reason of experience or special

training. It is my judgment, therefore, that the only evidence in the case which it is proper for the jury to consider upon that subject is the opinions of trained men in that field.

"Now, looking at the testimony of the men who have been witnesses here, who have shown an equipment or qualification to give us information upon that subject, I am clearly of the opinion that the jury would not be justified in finding either that the rail was unsafe and dangerous, or that the center casting was unsafe and dangerous, and therefore that the evidence fails to prove, in either of these respects, that the defendant has violated any duty, and is negligent.

"With reference to the question of inspection of the castings: There was by the evidence, and beyond dispute, an inspection of these castings by men who appeared by the evidence to have been competent inspectors, at the time they were separated and the engine jacked up. There was no inspection at any other time except that made by the engineers who ran them. I understand the plaintiff's contention to be that if the jury should find that these castings were so worn on the 13th of September, 1895, as to permit of side motion or shucking of an inch, or any similar or lesser amount, that that condition must have existed at the time of the last inspection, August 28th, some two weeks before the accident; and that the jury would be justified in finding that the defendant at that time knew, by notice to its employés and inspectors, that the center castings were so worn as to permit of shucking to a considerable degree,—an inch or less,—and that, therefore, the jury would be justified in finding that, with knowledge of that fact, the defendant sent Mr. Peppett out with this engine to his death. Now, I cannot adopt that view, or permit the jury to, under the evidence in this case. In my judgment, the evidence would not justify you in reaching that conclusion; and being of that opinion, and clearly so, it is my duty to so instruct you.

"Now, gentlemen, the view I have taken and expressed of the evidence with reference to these different bases of negligence makes it unnecessary to discuss them further, and I come now to other necessary elements of the plaintiff's case. And that is whether the conditions named, if assumed to be proved, are shown by the evidence to have been the cause of the derailment. And with reference to that subject I instruct you that the evidence does not, in

my opinion, justify you in finding or reaching that conclusion with reference to any one of them.

"I call your attention now, gentlemen, to another feature of the case, which is, in my opinion, decisive of the plaintiff's rights, when viewed with reference to certain of these claimed bases of negligence.   The plaintiff was, and for many years had been, an engineer on the Michigan Central Railroad.   He was intrusted with its most important service in that field, the running of engines that drew its passenger trains, and thus held the lives of many people in his hands,—a trust which nobody who has testified in the case here has ventured to say he did not faithfully fulfill, and which we must presume he faithfully fulfilled.   He had had wide experience; had been many years running from the same roundhouse; had taken his engine and returned it to the same place; was familiar with the defendant's method of conducting its business, so far as the business related to the inspection and the oiling and the running of its engines.   A part of his duties was to inspect the engine himself before he took it out upon the tracks to make his run and when he returned it. He was competent, under this evidence, to make that inspection,—a man of mature years, of ripe experience in the field, charged by his consciousness of his own safety, and that of his fellow workmen and the passengers whom he was to carry, with a quickened sense of his duty in making that inspection.   And he made it.   He made it knowing the custom and practice of the defendant company with reference to the oiling of the center castings, and its practice and custom, also, with reference to the treatment of his engine.   A part of his duties was to inspect the center castings; and he did inspect it, presumably, every morning before he made his trip,—certainly, under the evidence, the morning in question, before he made his trip.

"Now, he first assumed all the obvious risks of his employment.   He also assumed all the risks which would have been averted by an inspection properly made by himself.   Now, what would an inspection, properly made by himself, of the condition of that center casting, on the morning of September 13, 1895, have disclosed under this evidence?   It was made in conditions of light and surrounding obstacles which have been shown by the testimony,—conditions which the jury cannot say would have prevented him from finding out, if it were true, that these

center castings shucked an inch; possibly not if they shucked 3-16. But if they shucked an inch, or anything near it, a prudent inspection on his part would have disclosed it. It has been said to me in argument, in your absence, that some of the evidence shows that there was dust, dirt, accumulated by oil, perhaps gum, and other conditions, which would make it difficult for him to see whether those would shuck on that morning (shucking the model) more than was designed, or to a degree that made them unsafe; but the evidence also shows that he was provided with a light to make that examination, and, in my judgment, he was charged with the duty of making it. He could see it as well as any person on earth. He was familiar with the mechanism; knew how it operated; had been for years an observer of it, as of all parts of his engine. In my judgment, he cannot complain of any fault which a prudent inspection by himself at that time would have disclosed, and, if it shucked to any appreciable degree, he could, by an examination, have found it out. There might have been dust on the female part, or gum, or sand, or oil, but he was there charged with the duty of seeing that it was all right, and he cannot answer that he did not see by reason of difficulties that were surmountable, that presented themselves in his way.

" Now, it is conclusively apparent to me that whether the male or female casting, or both, were worn more below where the view strikes them than they were at the top, would make no difference in the amount of shucking that would be allowed. There certainly could be no more shucking of that engine than would be allowed by the upper or any part of the female casting. The movement is of parts which are fixed by being bolted to heavy machinery. (Illustrating the model.) It will lie upright and flat, and it is idle to say that a shucking would be possible beyond what would be allowed by such a separation of the parts at the top, where it would be seen, would allow it. Now, I have pointed to that aspect of the case because it is undisputed—cannot be disputed—that whatever risks of his employment were obvious to Mr. Peppett, or whatever he could have discovered by a prudent and reasonable inspection of these center castings, on the morning of that day, he cannot complain of in this suit, and he cannot, therefore, complain of any degree of shucking which an inspection, carefully made there at the time, would have disclosed; and it would have disclosed

as much as was possible under his evidence, save only such a condition—such changed conditions—as might have arisen in making the trip from Jackson to Marshall that morning.   *   *   *

"Now, gentlemen of the jury, I have taken some little pains, and used perhaps unnecessary words, to explain to you the views entertained by the court with reference to this case, and which are decisive of the case, in the judg-- ment of the court.   I need not say to you that I performed this duty impressed fully with the consciousness that it is an unwelcome duty, and should not be resorted to when the court is in doubt.   If, upon these propositions, there was evidence upon both sides, although the great burden and weight of it may have been in favor of the defendant, in my judgment it would be my duty to submit it to you. We all regret (none more than I) the great calamity which has fallen upon Mr. Peppett's family, but that is a consideration which we must seek some other place and time to express than here, in a court of justice.   The views I have expressed, gentlemen, lead to the conclusion that it is my duty to instruct you, as I now do, to return a verdict that the defendant is not guilty in manner and form as the plaintiff hath in her declaration in this case charged, and this you may say, without leaving your seats."

*Blair, Smith & Townsend,* for appellant.

*Parkinson & Campbell* and *O. E. Butterfield,* for appellee.

GRANT, C. J. (*after stating the facts*).   We approve the instructions of the court in directing a verdict.   The following facts are established by the evidence:

1. That the engine was properly constructed.

2. That defendant had performed its full duty as to inspection.

3. It was the duty of the decedent, both after coming in and before going out, to inspect the engine, and, after coming in, to minute in a book, kept for that purpose, any repair needed.   He did make such inspection, but reported nothing wrong.   The wearing, if any there was, was easily discernible.   He therefore assumed the risk of such defect.

4. If there was any testimony tending to show that the castings were worn, plaintiff introduced no testimony to show that such wearing would cause a derailment. On the contrary, defendant introduced the testimony of nine competent and experienced experts that such wearing has no tendency to cause a derailment.

5. The evidence is overwhelming that the rail was not worn sufficiently to cause the derailment. The state mechanical engineer and several others testified that the rail was safe. But more convincing than the testimony of these experts is the fact that the rail was not removed from its place, and was still in use at the time of the trial. It is, however, insisted that there was a conflict of testimony upon this point, and that the question, if it were material to the determination of the case, should have been submitted to the jury. The testimony on behalf of the defendant is as follows: One Isaac Bisbee lived near the track. On the Sunday after the wreck, he marked the rail where the wheels ran upon it with a cold-chisel on a flange of the rail. He testified that the same rail was still there 8 or 10 days before the trial, with his mark upon it. Daniel Foley, the road-master of the defendant road, testified that the rail had never been changed. Charles Belcher testified: "That rail is still in the track, and has not been taken away. It could not have been taken away without my knowledge." John Walters, a section man, testified that the track was not changed, and he had never known of the rail being taken out. Patrick Wall, assistant trackmaster, testified that he did not know of the rail having been changed, and that he should have known it if it had been. Elliott F. Moore, the state mechanical engineer, testified that some days after the wreck he saw the rail, which had a mark upon it, and that it was a safe rail, and in no respect dangerous. Warren B. Stimpson, superintendent of the Grand Rapids & Indiana Railroad, testified that he had seen the rail in the track which was marked by Mr. Bisbee, and that it was a fit and proper rail. The only testimony on the part of the plaintiff to

contradict the above testimony, and to show that the rail had been removed, is as follows: One Thomas Mapes saw the rail after the accident; saw a very slight mark across the top, and noticed that it was worn, but could not say how much, but that he considered it worn quite a good deal; that he had been along the track since, and was unable to find the mark upon it; that he was there about a week before the trial, and, in his opinion, that rail was not worn as much as the rail that was in there at the time of the wreck. On cross-examination, he testified that it was a mere matter of recollection, and, "I do not know that it is not the same rail, but I did not see this mark on the rail,—the reason that I did not think it was." William Hawkins testified that he noticed the rail at the time of the accident, and also within three or four days after the accident, and that the marks had then disappeared. On cross-examination he testified:

"*Q.* The same rail was there three or four days after, you say?

"*A.* I didn't use any such expression.

"*Q.* But didn't notice the mark?

"*A.* I said I looked for the rail, but the mark was gone.

"*Q.* Was it the same rail?

"*A.* If it was, they had destroyed the mark some way. I should not think it was the same rail.

"*Q.* You didn't notice any differences except the mark, did you?

"*A.* No; the rail was not worn as bad as the one that was in there the day of the accident.

"*Q.* Are you sure of that?

"*A.* I looked at that particularly.

"*Q.* Do you know that to be so?

"*A.* I could not swear to it, no; but, in my opinion, I think so."

Would a jury be justified, in any case, in finding that there was a serious conflict in the evidence, and in adopting the mere opinion or recollection of two witnesses, who made no measurements or careful examination, as against the positive testimony of six witnesses, who were unimpeached? No court, having due regard for justice, would

permit a verdict to stand when rendered against such positive and convincing evidence. Property rights are too sacred to be bartered away upon such flimsy statements. Mr. Bisbee was an entirely disinterested witness, engaged in the milling business, and made the mark with the chisel because there was some discussion among the men as to the point where the wheel left the track.

6. There was no testimony, from any one competent to speak, that any or all of the alleged defects caused the derailment, or that the engine or rails were not in a safe condition, such as is justified by good railroad management.

From the facts, it conclusively appears that no negligence on the part of the defendant was shown. It is not enough for the plaintiff to indicate a state of facts from which there is a possibility the accident occurred. The facts must be such as to indicate a reasonable probability that the accident occurred from the negligent acts charged. Plaintiff must establish the probable producing cause; otherwise, her case fails. The cause of this accident is as uncertain and problematical as was the cause of the accident in *Whalen* v. *Railroad Co.*, 114 Mich. 512. Plaintiff's counsel reason thus:

"Given a normal engine, running upon a normal track, under normal conditions, and the engine would not leave the track. The engine did leave the track, the surrounding conditions were normal, but the engine was certainly abnormal, and we think the track. It is a fair deduction that the abnormal conditions caused the abnormal result."

This reasoning would be sound, provided plaintiff had shown any causal connection between the alleged defects and the derailment. While juries deal with probabilities, and not with certainties, they can only do so when there are facts upon which to base the probabilities. Many accidents happen for which there is no reasonable explanation. In such cases, juries cannot be turned loose in the field of speculation. Employés assume the risk of all such accidents.

After plaintiff had rested, and defendant had occupied two days in putting in its testimony, plaintiff's counsel asked permission to reopen her case and introduce one expert witness. The most of the expert witnesses on the part of the defendant had been discharged and returned home, some of them at considerable distances. The testimony was not in rebuttal, but was part of plaintiff's main case. Her counsel recognized this, and offered the opinions of some witnesses as to the effects of the condition of the rail and the worn castings. They were not shown to have sufficient knowledge and experience to testify, and their testimony was excluded. Of this ruling no complaint is made. The circuit judge refused to admit the testimony. This is alleged as error, on the ground that the ruling was an abuse of discretion. We cannot concur in this view. We think the circuit judge was right in so ruling.

Judgment affirmed.

HOOKER and LONG, JJ., concurred with GRANT, C. J. MOORE, J., concurred in the result.

MONTGOMERY, J. (*dissenting*). While fully recognizing that this case lies very near the line, I am not able to assent fully to the views expressed by the Chief Justice. I think the evidence as to the worn condition of the rail, offered on behalf of the plaintiff, while relatively weak as compared with that of defendant, raised a question for the jury. *Clyde* v. *Railroad Co.*, 59 Fed. 394. I also think the question as to the condition of the center casting, and as to whether it was a probable cause of the derailment, was for the jury. *Schoepper* v. *Chemical Co.*, 113 Mich. 582. I do not think it conclusively appears that such defect in the center casting would be apparent to the engineer on such an inspection as he was required to make. As a majority of the court are well satisfied that the ruling below was correct, no good end would be served by elaborating my views.