WHALEN v. MICHIGAN CENTRAL RAILROAD CO.[1]

1. RAILROAD COMPANIES—NEGLIGENCE OF FELLOW-SERVANT.

The failure of the brakeman or conductor of a passenger train equipped with air brakes, in the use of which they have been properly instructed, to pull the automatic cord by which the brakes are operated in response to the engineer's signal, is, as to the engineer, the negligence of a fellow-servant, for which the railroad company is not liable.

2. SAME—CONDUCT OF EMPLOYÉS—ORAL INSTRUCTIONS.

It is not essential, in order to relieve the company from liability in such case, that the instructions as to the use of the automatic cord should have been embodied in the company's printed rules; it is sufficient if the negligent employés were informed of their duties by oral instruction.

3. SAME—RULES AND REGULATIONS—SUFFICIENCY.

In an action against a railroad company by a locomotive engineer for injuries sustained in a collision, it was error to submit to the jury the question whether the rules adopted by the defendant for the control and management of its trains were reasonably sufficient for the protection of employés, where there was no evidence of carelessness in the formulation of the rules, nor of prior accident attending their operation, nor of more effective regulations adopted by other roads.

4. SAME — INJURY TO EMPLOYÉ — UNACCOUNTABLE ACCIDENT — ASSUMPTION OF RISK.

Plaintiff, a locomotive engineer in the employ of defendant, was in charge of a west-bound special of 11 coaches. Thirty minutes in advance was another special. While the first train was standing on the tracks at the J. depot, the second crashed into the rear of it, and plaintiff was injured. It appeared that the semaphore east of the J. depot indicated that the tracks at the station were occupied, and that plaintiff, upon seeing the signal, attempted by means of the air brakes to stop his train, but that the brakes, for some unexpected and unaccountable reason, failed to work. Plaintiff was an experienced engineer; was familiar with the rules and regulations of the company; knew that they required

[1] Rehearing denied January 25, 1898.

him to approach the station at J. upon the presumption that the track would be occupied; knew the location of the semaphore, and its use; and knew that the air brakes were ordinarily sufficient to stop the train.   Neither he nor any one else had made complaint.   *Held,* that he assumed the risk.

5. SAME—LOCATION OF SEMAPHORE—ORDINARY CARE.

The semaphore in question had been placed by men of experience in railroading, and was visible for more than half a mile. Its warning would have been effective to prevent the accident had it not been for the unexpected failure of the air brakes. Plaintiff testified that, if it had been located about a mile farther east, he could have stopped his train without the brakes in time to avoid the collision.   *Held,* that it was error to submit to the jury, upon this evidence, the question of defendant's negligence in locating the signal; it not being bound to guard against the possibility of unusual accident.

6. SAME—TRACK RULES.

Failure of the railroad company to notify the engineer that the advance train stood on the track at the station would not render it liable to him for the injury, in view of a rule of the company requiring him to act on the supposition that another train would be met, or that the main track would be occupied at the station.

7. SAME—SPEED OF TRAINS.

One of the rules adopted by the railroad company for the guidance of engineers read as follows:  "All passenger trains will use four minutes between east switch at J. Junction and J." The preceding rule stated that signals had been erected east and west of J., and east and west of J. Junction, and directed that all trains should come to a full stop when a red signal was displayed, and not proceed until the signal had been changed. The succeeding rule declared that all trains approaching J. and J. Junction must be under full control, so as to be able to stop in case the track should from any cause be occupied, and that a sharp lookout must be kept for signals in approaching such points.   *Held,* that the rule as to time indicated the minimum, not the maximum, time which should be used between J. and J. Junction.

Error to Washtenaw; Kinne, J.   Submitted June 18, 1897.   Decided October 1, 1897.

114 MICH.—33.

Case by William Whalen against the Michigan Central Railroad Company for personal injuries. From a judgment for plaintiff, defendant brings error. Reversed.

Plaintiff, a locomotive engineer in the employ of the defendant, left Detroit for Chicago on the morning of October 13, 1893, in charge of a special passenger train of 11 coaches. Thirty minutes in advance of this was another special train, of about the same number. The first train had stopped at the Jackson depot 20 minutes for breakfast. The second train crashed into the rear of the other, killing and injuring many passengers. Plaintiff, finding himself unable to stop his train by the application of the air brakes, jumped through the window of the cab, and was injured. This is an action of tort to recover damages for the injuries then received. The negligent acts charged are:

1. The negligent and careless construction of the angle cock which constitutes a part of the air-brake system.
2. Negligence in permitting it to get out of repair.
3. The negligent and careless construction of the conductor's valve, cords, and devices forming part of the system of air brakes.
4. Negligence in permitting them to get out of repair.
5. The employment of incompetent conductor, baggageman, and brakemen.
6. Negligence in locating and painting its semaphore placed to the east of the Jackson depot.
7. Negligence in permitting its track to become obstructed with the engine and cars in front of said depot.
8. Failure to provide and enforce reasonable and suitable rules for the governance of its servants in the use of said brakes.
9. Failure to give plaintiff proper and sufficient notice and warning that the track was so occupied and obstructed.

Plaintiff recovered a verdict and judgment.

The instructions given to plaintiff were to run to Jackson regardless of all freight trains. The train made only one stop (at Ypsilanti for water) between Detroit and Jackson. It was supplied with air brakes, which are con-

trolled by the engineer. Each car was also supplied with
an apparatus known as the "conductor's valve," which is
operated by the pulling of a cord which opens the valve
and allows the air to escape, thus setting the brakes. If
the engineer whistles for brakes, it is the duty of the con-
ductor and other trainmen to pull this cord so as to set the
brakes. If the air is shut off from the engine, it prevents
the setting of the brakes back of the shut-off. By pulling
the conductor's cord the brakes can be set. Rule 77 of the
defendant company requires that each engineer must test
the air brake at least one mile before reaching the regular
stops, and, in case the machinery does not hold, must at
once signal for brakes. Plaintiff testified that he made
this test at Wayne, Ypsilanti, Ann Arbor, Dexter, and
Jackson Junction, which is about a mile and a half east of
Jackson, and that these tests were all satisfactory. After
passing Jackson Junction he made another, which was
not satisfactory. He at once whistled for brakes. About
the same time his fireman discovered that the semaphore
was against them, which notified them that the track
ahead was occupied, and that they must stop. This sema-
phore was operated by electricity from Jackson station;
was a thin iron plate, about 2 feet long and 10 inches wide,
set upon a pole about 30 feet high, with a round hole in
each end of the plate. The conductor heard the whistle
for brakes, and immediately pulled the automatic cord in
one of the cars, but said it had no effect on the train. He
then went to the platform to look ahead. He testified
that he was then about 15 car lengths from the sema-
phore. The engineer again whistled for brakes. The
conductor then went into another car and pulled the cord,
but testified that he got no effect. Meanwhile the engineer
reversed his engine and let sand upon the rails, but did
not succeed in stopping the train. The semaphore was
located 925 feet east of the east end of the depot, and was
470 feet east of the rear of the advance train. From the
semaphore to Elm avenue is 3,512 feet. It was in the
vicinity of this avenue that the plaintiff discovered that

for some reason the air brakes did not work, that the semaphore was turned against him, and whistled for brakes.

The following rules were adopted for the guidance of engineers:

"*Rule 10.* All trains approaching stations where semaphores are in use must be under full control, so as to be able to stop before reaching the semaphore if the arm should be extended, or a red light shown.

"*Rule 11.* When the semaphore arm is extended by day, or red light shown at night, all trains will come to a full stop, and not proceed until arm has been lowered or white light shown, except under protection of flag, as follows: In case any train shall have been stopped by semaphore, such train may and should proceed beyond the semaphore under protection of flag. In such cases a flagman must be sent in advance of such train in a sufficient distance to protect it against any train or obstruction upon main track, or any train or engine working upon main track under protection of semaphore. The conductors of all trains stopped by semaphore must at once take measures to protect the rear of their trains as per rule 46."

"*Rule 73.* Engineers of trains moved by special order, and of all special, extra, and working trains, will approach stations with extreme caution, upon the supposition that another train will be met, or that the main track will be occupied, and will carefully approach stations at which they ought to meet or pass trains, and, on approaching those at which the train is to stop, shut off steam early enough so that, by the application of brakes to train, the speed will be reduced, and train under full control until brought to a full stop. No train will run over any portion of the road at a greater rate of speed than the order calls for."

"*Rule 133.* Electric signals have been erected east and west of Jackson Junction, east and west of Jackson passenger station on main line, west of Jackson Junction on air line, west and north of Jackson and Saginaw and Grand Rapids branches at Cooper, Mechanic, and north of Ganson street. When the main tracks are obstructed between the signals, a red board will be shown by day, and a red light by night. When the tracks are clear, nothing will be shown by day, but a white light will be shown by night. All trains will come to a full stop when

a red board or red light is displayed, and not proceed until the signal has been changed."

"*Rule 135.* All trains approaching West Detroit, Junction Yard, South Yard, Ypsilanti, Dexter, Jackson Junction, Jackson, Niles, New Buffalo, Michigan Central Yard, Michigan City, Lake, and Kensington must be under full control, so as to be able to stop in case the main track should from any cause be occupied. A sharp lookout must be kept for signals in approaching above points."

A part of rule 134 reads as follows:

"All passenger trains will use four minutes between east switch at Jackson Junction and Jackson."

The court eliminated from the consideration of the jury most of the grounds of negligence alleged in the declaration, by instructing them that there was no evidence to support them. The theory upon which the case was left to the jury is shown in the following excerpt from the charge:

"For the purpose of this case, it may be conceded that the failure of the air brakes to perform their work was the cause of this accident, and that the cause of such failure rests in doubt and obscurity; but nevertheless there is presented to you by the evidence this more important question, whether or not the contingency and possibility of such failure of the air brakes to work did not, in the exercise of ordinary care and prudence, demand of the railroad company the use and exercise of other and further precautions than were taken in this case, in view of the fact that such an emergency might at any moment arise, and in this case did actually exist. * * * If the jury shall find from the evidence in this case that, notwithstanding the displacement of the angle cock upon the plaintiff's engine, if the defendant had placed its semaphore in such a position as to give the plaintiff reasonable notice of the danger, or if the defendant had informed him at Grass Lake that the train would be on the main track when he arrived at Jackson, he would have been able to have prevented the accident, then the defendant was negligent. It was the duty of the defendant to formulate and promulgate such rules and regulations for the management and control of its

trains, which, if properly observed, would afford reasonable protection to the plaintiff; and whether or not the defendant in this case has been guilty of negligence is a question for the jury. * * * If the jury believe from the evidence in this case that by the exercise of reasonable diligence the defendant would have known that the angle cock upon its engine was liable to get turned and out of place, or that the machinery called the 'air brakes' might become out of repair, and unserviceable in the stopping of its train, then it was the duty of the defendant to have so placed its semaphore and located its signals, or to have formulated and enforced such rules for the management of its business, as to have enabled the plaintiff, after having received notice of the danger, to have stopped his train, even though the air brakes were out of repair and unserviceable, before reaching the point of danger."

Plaintiff had been in the employ of the defendant for 13 years, during 7 of which he had been a locomotive engineer. His principal runs had been on the Middle Division, extending between Jackson and Michigan City, on both the Main and Air Lines. His counsel urge that there is testimony tending to show that he was not familiar with the yard at Jackson, and the location of the semaphore. The conclusive testimony is otherwise. He acknowledged on cross-examination that he knew it was there, and that he knew what it was for. The system of signals is as follows:

"At each telegraph station along the line there was located what is called an 'order board;' being a metal disk with two holes through it, giving it the appearance of a pair of spectacles, suspended in front of the telegraph office. When this was displayed at right angles with the track, no train was allowed to pass it until it was turned to a position parallel with the tracks. The order board was operated by the man in charge of the telegraph station, but under the direction, always, of the train dispatcher. When a train passed Ypsilanti, for example, the order board was displayed behind it, at the danger position, allowing no trains to pass in the same direction until the preceding train had passed Geddes, the next station west of Ypsilanti. The order board would then be taken in by order of the dispatcher, and the fol-

lowing train allowed to proceed to Geddes, and so on. At division points, like Jackson, where a large number of trains came in from different directions, semaphores were in use.    Arriving at Jackson, the conductor had orders to report to the dispatcher that his train was there, and the semaphore up behind him.    The order board would then be taken in at Grass Lake, the next station east of Jackson, and following trains permitted to proceed to the semaphore at Jackson.    This system of operating the telegraph signals was not communicated to the engineers. The rules of the company informed the engineers that they should never pass an order board nor a semaphore when they stood at the danger position, and it was considered wise by the operating officers not to inform the engineers further as to the use of the telegraph signals. This semaphore east of the depot at Jackson was so constructed that, if anything happened to the electrical apparatus by which it was operated, it would fall automatically to the danger position, and hold all trains."

The force of the collision was such that the tender was thrown across the track, and the baggage car lay at right angles with it, tipped at an angle of about 45 degrees. An examination after the accident disclosed the fact that the angle cock at the rear end of the tender was turned so as to cut off communication between the engine and the cars, and prevent the passage of air from the pump to the auxiliaries under the cars.    When or by what means this angle cock was turned is unknown.    Plaintiff testified that, as the train approached the yard at Jackson, it was running about 40 to 45 miles an hour; that, by applying the test east of Jackson Junction, he had reduced the speed to 25 miles an hour; that he had shut off steam east of the junction; that if he had known of the condition of things, and the semaphore had been located far enough east so that he could have seen it when opposite Mr. Casnir's office, he could have stopped his train without the brakes in time to avoid the collision; and that the semaphore would then have been "very near half a mile" farther east.    By actual measurement, it would have been 4,647 feet farther east, and 5,572 feet east of the east end of the depot.    A careful and minute inspection of the pipes

and valves was made immediately after the accident by experienced men. The hose on the engine and tender was split open in order to ascertain if there was any obstruction in it. No obstruction was found, and the engineer's brake valve was in perfect order. The brakes on the train were all set tight, and had to be released before the cars could be moved. Eight cars of the train were continued on the journey to Chicago, and the brakes upon them worked perfectly. We have, then, this singular situation: Machinery is in perfect working order about three minutes before an accident, and found in perfect condition immediately after.

*John F. Lawrence* (*James A. Parkinson*, of counsel), for appellant.

*A. J. Sawyer* and *Richard Price*, for appellee.

GRANT, J. (*after stating the facts*). 1. There is nothing in the record to indicate that the trainmen were not properly instructed in the use of the automatic conductor's cord when the engineer whistled for brakes. The law does not require that all the minute instructions in regard to the running of trains shall be printed for the use of its employés. If the trainmen whose duty it was to pull this cord in case of emergency were properly instructed orally as to its use, this was sufficient. Every employé who was examined upon this point testified that he was instructed in its use. If, therefore, the brakeman or conductor failed to perform this duty when plaintiff whistled for brakes, this was the negligence of a fellow-servant, for which defendant is not liable. The risk of such negligence is one which he assumed. As is well stated in the brief of defendant: "It might as well be said that the defendant should print a rule telling a brakeman how to turn a hand brake, or how to couple two cars together. It is part of their training, and need not be printed in any rule."

Plaintiff has failed to show that the printed rules and

regulations adopted by the defendant for the management of its trains were not reasonably sufficient. They were adopted by men skilled and experienced in railroading, and after years of experience. They had proved sufficient prior to this accident. The defendant had for several months been running special trains under this system to and from the Columbian Exposition at Chicago, and it had proved effective, not an accident having occurred before. And now, when an accident has occurred in a manner wholly unaccountable, a jury is permitted to speculate and find culpable negligence upon the theory that the defendant might have avoided the accident by the adoption and publication of some other rules. There is no conflict of evidence, and therefore no question for the jury. Bailey, Mast. Liab. 75. There is no evidence that any other railroad has adopted other regulations found to be more effective. *Slater* v. *Jewett*, 85 N. Y. 61. In that case the court say of the rules adopted, "They had been in operation several years before the disaster, and no accident had ever taken place in the use of them."

2. Plaintiff was an experienced engineer; was entirely familiar with the rules and regulations of the company, and with the signals adopted for his own protection, and the protection of passengers and the property of the defendant. He knew the location of the semaphore at Jackson, the method and purpose of its use, that he was liable to find it turned against him, that he should approach it upon the supposition that it would be so turned, and that the track at Jackson station would be occupied. He also knew that the air brake under his control was sufficient to stop the train, and that, if this failed, the automatic or conductor's valve was usually sufficient for the purpose. Neither he nor any one else made complaint. He therefore assumed the risk of the unexpected, unusual, unexplained, and unaccountable failure of the air brakes to work. *Illinois Cent. R. Co.* v. *Neer*, 26 Ill. App. 356.

3. Defendant equipped the train with all the tools,

machinery, and appliances which experience and skill had shown to be essential to safety. It had employed competent men, and properly instructed them in the use of these appliances, which had proved almost universally sufficient. They proved sufficient in this case until within three to five minutes of the failure of the braking apparatus to work. It is conceded by the plaintiff in his testimony, and by his counsel in their briefs, that, if the apparatus had operated, the train would have been stopped, and the accident avoided. No similar failure of the air brakes to work is shown. One witness testified that he had once known of an angle cock being turned, but under what circumstances, and whether it was turned before the train started, or when in' motion, does not appear. This was no warning to defendant that the entire system of air brakes was likely to fail at any time. *Robinson* v. *Wright & Co.*, 94 Mich. 283. So well has the system worked that Mr. Mathews, the rear brakeman, a witness for plaintiff, testified that during his employment by the defendant he had never been signaled for brakes by the engineer. He had been so employed for nearly seven months before the accident, and how much longer does not appear. If the turning of the angle cock prevented the operation of the brakes by the engineer from his engine, it is wholly unexplained how it became so turned. Various theories are advanced, which it is unnecessary to mention. There is no tangible evidence to support any theory. All we know is that the angle cock was found turned after the accident, and that it could not, according to the testimony, have been turned from three to five minutes before. No one advances any theory as to why the conductor's valve failed to work and set the brakes. But the jury were left to infer negligence because, in their opinion and that of some of the witnesses, the semaphore should have been placed farther east, so as to guard against any possible failure of the brakes to work. It is easy to see how an accident might have been prevented, but the possibility of guarding against it is not

culpable negligence.   *Schroeder* v. *Car Co.*, 56 Mich. 132;
*Redmond* v. *Lumber Co.*, 96 Mich. 545; *Werbowlsky* v.
*Railway Co.*, 86 Mich. 236 (24 Am. St. Rep. 120); *Sjog-
ren* v. *Hall*, 53 Mich. 274.   In *Schroeder* v. *Car Co.* this
court said:

"When an injury has happened, it may be easy to
point out, as it is now in this case, how some particular
precaution would have given protection.   But the fact of
injury, and the possibility of guarding against it, do not
necessarily make out a case of culpable negligence.   Very
few acts in life are done with such care to prevent acci-
dents as would have been possible, and the law only re-
quires of any one that degree of care and prudence which
persons who are reasonably careful ordinarily observe.
To require more would put everybody under restraints in
the management of his business and in his dealings with
others which would be more hurtful in the embarrassments
they would cause than beneficial in the protection they
could give against injuries."

Yet the learned circuit judge left it to the jury to decide
whether it was not the duty of the defendant to guard
against the *possibility* of accident by placing this sema-
phore at such a distance farther east as they might think
would have enabled plaintiff to stop the train without the
brakes.   No complaint had ever been made of the location
of this semaphore.   It could be seen, and was in this
instance, according to the testimony of plaintiff and the
fireman, seen by them, for more than half a mile.   As
already stated, this was the year of the Columbian Expo-
sition at Chicago.   The defendant had been engaged in
running many trains daily, and up to this time the sema-
phore had proved sufficient.   It would in this instance
have done so but for the unaccountable failure of a piece
of machinery to operate.   The semaphore had been placed
by men of experience in railroading, who located it accord-
ing to their best judgment.   We see no justice in a rule
which would permit a jury to find that it was not properly
located.   The instructions, if adopted, would abrogate the
well-established rule stated by Mr. Bailey, as follows:

"It must be kept in mind that ordinary care, as to safety of appliances and premises, does not require that every possible contingency must be anticipated and guarded against, but only such contingencies as are likely to occur. A master is not bound to change his machinery in order to apply every new invention or supposed improvement in appliances, and he may even have in use a machine or appliance shown to be less safe than another in general use, without being liable to his servant for the consequences of the use of it. If the servant thinks proper to operate such a machine, it is at his own risk. All that he can require is that he shall not be deceived as to the degree of danger that he incurs." Bailey, Mast. Liab. 18.

4. It is stated in plaintiff's brief that he was notified at Grass Lake that the train ahead had left Jackson station. We find nothing in the record to justify this statement. Probably it is based upon the fact that he was not stopped at Grass Lake, but the signal there notified him to proceed. It did not, however, notify him that the train in advance had left the station. He proceeded with knowledge of rule 73, and that there was another signal which he might find against him at the junction, and he knew it was his duty to watch for it and heed it. If he acted upon the belief that the track was clear to the station, and ran his train accordingly, it may account for the accident. It is also urged in this connection that the defendant might have avoided the accident by notifying plaintiff that the advance train stood upon the track at the station. The reply to this is that his duty in the management of his train was the same as it would have been if he had had actual knowledge. Rule 73 told him that he must act "upon the supposition that another train will be met, or that the main track will be occupied." *Enright* v. *Railway Co.*, 93 Mich. 409.

5. It is claimed that the part of rule 134 above quoted required plaintiff to run from the east switch at Jackson Junction to Jackson within four minutes,—that is, that the time must not exceed four minutes,—and that this would require a speed of from 22 to 25 miles per hour. This rule must be construed in connection with the other

rules, and, when all are considered, it is apparent that this is not a rule intended to hasten the movement of trains, but rather to delay them at this point, where there are many tracks, and many trains going and coming over the various divisions of the road.   It is intended as a minimum limit of time, and leaves engineers to exercise their own judgment above it under the other rules.

Under this record, the court should have directed a verdict for the defendant.

Judgment reversed, and new trial ordered.

The other Justices concurred.