Argued 16 December, 1901; decided 20 January, 1902.

## WAGNER *v.* PORTLAND.

[60 Pac. 985, 67 Pac. 300.]

40  389
40  442,

40  389
42  541

40   389
f48   38

RULES OF COURT—AMENDING ABSTRACT.

1. Where a rule of court has become uncertain in meaning by the enactment of statutes since its announcement, parties who have attempted in good faith to comply with the rule should be allowed to amend their papers so as to prevent injustice or hardship.

RULES—EXCUSING DEFAULT IN FILING BRIEFS.

2. Sickness of counsel is a sufficient excuse for a short delay in filing a brief, under Rule 6 of this court, the delay not affecting the jurisdiction.

MUNICIPALITY—AGENCY OF BOARD OF FIRE COMMISSIONERS.

3. A board of fire commissioners appointed under a city charter authorizing the mayor to appoint a board of fire commissioners, which board shall have exclusive power and authority to organize and control the fire department, is not an independent body, but its acts are those of the city, for which the latter is liable.

LIABILITY OF CITY FOR NEGLIGENCE OF ITS AGENTS.

4. A city engaged in the legal duty of repairing its fire alarm system through private and corporate agencies is acting in its corporate capacity and in the performance of ministerial acts, and is liable for injuries received by a workman therein.

ACTIONS AGAINST PUBLIC CORPORATIONS.

5. Hill's Ann. Laws, § 350, providing that an action may be maintained against any public corporation in this state, in its corporate character, and within the scope of its authority, for an injury to plaintiff from some act or omission of such public corporation, authorizes an action against a city only when it is liable in its corporate capacity, as distinguished from its political or governmental capacity.

FELLOW SERVANTS—NEGLIGENCE OF EMPLOYER.

6. Workmen jointly engaged with plaintiff in removing an electric wire, who were not under any special directions, but were using their judgment as to the manner of the work, are fellow servants with plaintiff; and a recovery cannot be had from the common employer for injuries received, unless it was derelict in its duty, in not taking proper precautionary measures for the safety of employes, whereby the injury ensued without the concurrence of plaintiff's acts, or those of fellow servants.

MASTER AND SERVANT—PROVIDING RULES—QUESTION FOR JURY.

7. In an action by a workman against his employer for damages from an injury claimed to have been caused by the negligence of the latter, the question whether defendant was negligent in omitting to adopt suitable rules is for the court, in the absence of any evidence showing the necessity and practicability of such rules.

QUALIFICATION OF WITNESS ON EXPERT SUBJECT.

8. Before a witness should be permitted to testify on a matter requiring expert knowledge he should be shown to be skilled touching the subject of inquiry.

EVIDENCE—SHOWING NECESSITY FOR RULES BY EMPLOYER.

9. Questions asked a witness who was not shown to be an expert as to the necessity of rules for taking down electric wires, and questions regarding the adoption of rules by other companies doing that class of work, but which were not confined to the specific rules which plaintiff insisted should have been adopted, which questions were objected to by defendant, did not constitute such an effort to show the necessity of such rules as to preclude defendant from insisting on a lack of evidence in this particular.

NECESSITY FOR RULES—ELECTRIC WIRES.

10. When several fellow servants are taking down electric wires, and not acting under any regulations, the cutting of a wire at the proper place for the convenience of the work and to insure the safety of the employees, is a detail of the work, which was for the judgment and control of the workman themselves, and not for the master to regulate by the adoption of rules for their guidance.

MASTER AND SERVANT—ASSUMING RISK OF EMPLOYMENT.

11. A workman who has worked for two months and a half in taking down electric wires without using rubber gloves, or boards to stand on, knowing the hazards attending the work, will be deemed to have assumed the risk of performing this work without such appliances.

HAZARD OF EMPLOYMENT—KNOWLEDGE OF EMPLOYEE.

12. A man of mature years, not laboring under any mental disability, engaged in taking down fire alarm wires, who had been warned by a fellow servant of the danger of being killed while working in proximity to an electric company's wires, and who had heard two fellow servants say they had received shocks, and had witnessed the effect of electricity on a horse, will not be deemed ignorant of the danger of electricity, and of the hazards of the employment.

From. Multnomah:   ALFRED F. SEARS, JR., Judge.

Action by Henry M. Wagner against the City of Portland. From a judgment in favor of the plaintiff, the defendant appeals. A motion to dismiss the appeal was overruled, and the case was heard on its merits.                          REVERSED.

Decided 5 May, 1900.

ON MOTION TO DISMISS APPEAL.

*Mr. Thos. O'Day*, for the motion.

*Mr. Joel M. Long*, contra.

PER CURIAM.   This is a motion to dismiss the appeal herein for two reasons: First, the abstract of record contains no assignment of errors relied upon for a reversal of the case;

and, second, appellant has not filed its brief within the time required by the rules of this court.

1. The procedure on appeal has been materially amended by the late act of the legislative assembly.: Laws, 1899, p. 227. A party may now appeal by giving notice in open court, or before the judge thereof at chambers, at the time of the rendition of the order, judgment, or decree, that he appeals therefrom, or from some specified part thereof; or, if not taken at the time, he may. appeal by causing a notice signed by himself or attorney to be served on the adverse party or parties that have appeared in the action, and such notice shall be sufficient if it contains the title of the cause, the names of the parties, and notifies the adverse party, or his attorney, that an appeal is taken to the higher court (designating it) from the judgment, order, or decree, or some specified part thereof. It will be observed that it is not necessary to specify or assign errors in the notice of appeal, as was formerly the case. The rules of the court were adopted in view of the old law, and hence, under rule 9 (24 Or. 599, 37 Pac. vii.), it is prescribed that, if the appeal is from a judgment in an action, the appellant shall set out in his abstract of record those assignments of error in the notice of appeal on which he intends to rely, and none other. As the law now requires no assignments of error in the notice of appeal, it is urged that under rule 9 no statement of errors in the abstract is necessary, and that rule 10 (37 Pac. viii.), providing that where an abstract has been served no question appearing upon the record will be examined or considered on the hearing in this court except such as may arise upon the assignments of error contained in the printed abstract, is thereby rendered nugatory, in so far as it may pertain to actions at law. There is much force in the contention, for, under the present law, at least, it is not clear what assignments of error in law cases must be set out in the abstract. The appellant should, therefore, in the interest of justice, have the benefit of the doubt, and be allowed to amend its abstract by serving and filing assignments of error within ten days. This is the first time that our attention

has been called to the want of clearness in the rules in this regard since the amendatory act of 1899, and the necessary amendments are now being considered, and will be promulgated at an early day.

2. As it pertains to the second reason for dismissal, it appears that appellant's brief was filed a few days after the expiration of an extended time for filing same. In this appellant is in default, but it is not vital to the jurisdiction of the court. The delay was caused by sickness of counsel, and appellant will be relieved of the default, and the brief allowed to stand as filed. The motion will therefore be overruled.

MOTION OVERRULED.

Decided 20 January, 1902.

ON THE MERITS.

For appellant there was a brief over the names of *Joel M. Long,* city attorney, and *Ralph R. Duniway,* with an oral argument by *Mr. Long.*

For respondent there was a brief over the name of *O'Day & Tarpley,* with an oral argument by *Mr. Thos. O'Day.*

MR. JUSTICE WOLVERTON delivered the opinion.

A board consisting of three commissioners appointed by the mayor is given by the charter of the City of Portland full, complete, and exclusive power and authority on behalf of the city to perform all executive functions thereof in the organization, management, and control of its fire department, and all powers and duties incident thereto: Laws 1898, p. 132, § 87. In pursuance of this authority, such board had under its control and management a system of fire alarm wires; being the property of the city, and used for communicating alarms of fire occurring therein. R. G. Paddock, who was the city electrician, and superintendent of the system, deriving his authority from the board, employed the plaintiff as groundman. While engaged in that capacity, keeping the system in repair,

he was injured by receiving a shock from an electrical current, for which injury he brings this action for damages, alleging that it was caused by the negligence of the municipality; and, having obtained a judgment in the trial court, the defendant appeals.

By defendant's separate defense, which was stricken out on motion, two questions are presented, which lie at the threshold of the controversy. It is maintained with much emphasis (1) that the board of fire commissioners is an independent body, so constituted by the charter, with full and exclusive power and control over the fire department, and the city is in no sense responsible for its acts; and (2) that the board, in prosecuting such improvement, acted in a political and governmental, rather than in a private or corporate, capacity, and therefore it cannot be held amenable for the negligence of its officers and agents. The two positions are not altogether consistent, as the latter seems to assume that the fire department is not an independent body, such as to shift liability from the city. But the purpose is manifest to save both questions, and, if the former is decided adversely to the contention, then the latter becomes a live issue.

3. We think that the charter settles the former. It vests in the board the executive functions of the city pertaining to the organization, management, and control of the fire department, and all powers and duties incident thereto. As to this particular department, therefore, the board stands in the place and stead of the common council, exercising the authority of that body; and its acts become as much the acts of the city as if the common council had performed them, had not the authority in the premises been transferred to the board.

4. As to the latter question, it is one of more difficulty,—not so much in the finding of general rules governing the liability of municipal corporations for torts committed through their officers and agents, but in determining where the case falls, and by what rules it is governed. Municipal corporations exist in a dual capacity, and their functions are twofold. In one, they exercise the right springing from sovereignty, and

while in the performance of the duties pertaining thereto their acts are political and governmental. Their officers and agents, though elected or appointed and paid by them, are nevertheless public functionaries, performing a public service, in which the corporations, as such, have no particular interest, and from which they derive no special benefit or advantage in their private or corporate capacity. Such officials are not, strictly speaking, the servants and agents of the municipalities through which they derive their authority, but are officers, agents, and servants of the state (that is, the political divisions thereof, or the public at large), and for their acts of omission and commission the municipalities themselves are not liable. In the other, they exercise a private, proprietary, or corporate right, arising from their existence as legal persons; and where the duty is one that rests upon the municipalities in respect of their special or local interests, and not as public agencies, and is absolute and perfect, not discretionary or judicial in its nature, their officers and agents in the performance of the function or duty act in behalf of, or as the *alter ego* of, the municipalities in their corporate capacity, and not for the state or public at large, and for their acts the municipalities are held to accountability. This has become the settled doctrine in the jurisprudence of this country, about which there is no dissent: *Caspary* v. *City of Portland*, 19 Or. 496 (24 Pac. 1036, 20 Am. St. Rep. 842); *Esberg Cigar Co.* v. *Portland*, 34 Or. 282 (55 Pac. 961, 43 L. R. A. 435, 5 Am. Neg. Rep. 292, 75 Am. St. Rep. 651), and cases there cited; 1 Jaggard, Torts, 173, 179; Mechem, Pub. Off. §§ 850, 853; 2 Dillon, Mun. Corp. (3 ed.) § 980. Touching the liability of municipalities in their corporate capacity, the rule is succinctly stated in *Wright* v. *City Council of Augusta*, 78 Ga. 241 (6 Am. St. Rep. 256), as follows: "Whenever the negligence or nonfeasance of the ordinary agents and servants of the corporation, as distinguished from that of its officers, causes the injury, or when the loss results from acts merely ministerial, as distinguished from such as are legislative and governmental in character, exercised for the sole and immedi-

ate benefit of the public, or where the corporation is exercising, as a corporation, its private franchise, powers, and privileges, which belong to it for its immediate corporate benefit, or is dealing with property held by it for its corporate advantage, gain, or emolument, though inuring ultimately to the benefit of the general public, then, and only then, it becomes liable for the negligent exercise of such powers, precisely as are individuals.''

Undeniably, municipalities, when acting through their fire departments in the preservation of property from the devastation of fire, are in the exercise of a purely governmental function, and their officers and agents represent the public, as an arm of the state, for whose acts the corporations are not liable.  It was so held in *Hafford* v. *City of New Bedford,* 16 Gray, 297, where certain of the firemen negligently ran a hose carriage against the plaintiff and injured him.  So, in *Fisher* v. *City of Boston,* 104 Mass. 87 (6 Am. Rep. 196), where the hose provided by the city, and in use through the fire department, burst, causing the injury complained of.  In this case Mr. Justice GRAY, now of the Supreme Court of the United States, says: ''But the extinguishment of fires is not for the immediate advantage of the town in its corporate capacity; nor is any part of the expense thereof authorized to be assessed upon owners of buildings, or any other special class of persons whose property is peculiarly benefited or protected thereby.  In the absence of express statute, therefore, municipal corporations are no more liable to actions for injuries occasioned by reason of negligence in using or keeping in repair the fire engines owned by them, than in the case of a town house or a public way.  *  *  *  It makes no difference whether the legislature itself prescribes the duties of the officers charged with the repair and management of fire engines, or delegates to the city or town the definition of those duties by ordinance or by-law.  However appointed or elected, such persons are public officers, who perform duties imposed by law for the benefit of all the citizens, the performance of which the city or town has no control over, and derives no benefit

from, in its corporate capacity. The acts of such public offi-
cers are their own official acts, and not the acts of the munici-
pal corporation or its agents.'' And in *Mendel* v. *City of
Wheeling,* 28 W. Va. 233 (57 Am. Rep. 665), where the city
authorities allowed pipes laid to plaintiff's premises for con-
ducting water thereto, to be used for fire and other purposes,
to fill up so as not to be serviceable in the extinguishment of a
fire, to his damage, the same doctrine was upheld. So, also, in
*Welsh* v. *Village of Rutland,* 56 Vt. 228 (48 Am. Rep. 762),
where the engineer of the fire department, under the direction
of the village trustees, in thawing out a hydrant connected
with an aqueduct flooded the street with water, which becom-
ing frozen, the plaintiff was injured by falling thereon. And
in *Wilcox* v. *City of Chicago,* 107 Ill. 334 (47 Am. Rep. 434),
where the plaintiff sustained injury by the collision of a hook
and ladder wagon with his carriage; also in *Edgerly* v. *Con-
cord,* 62 N. H. 8 (13 Am. St. Rep. 533), where the injury oc-
curred through fright of the plaintiff's horse, caused by a
stream of water thrown from a hydrant by the officers of the
fire department, at the request of the mayor of the city, for the
purpose of testing the capacity of the hydrant; and, again, in
*Kies* v. *City of Erie,* 135 Pa. 144 (19 Atl. 942, 20 Am. St.
Rep. 867), where the door of an engine house was so negli-
gently operated that, when being opened upon the sidewalk,
it struck a pedestrian and injured him. Many other cases
might be cited, but these are sufficient to illustrate the doc-
trine. The nonliability of the municipality is based upon the
idea that it is acting in a public or governmental capacity, as
an arm of the state, and hence the doctrine of *respondeat su-
perior* is without application.

But the case at bar is distinguishable from any of these
cases, or any that we have been able to find applying the doc-
trine referred to therein. Here the city was acting in the dis-
charge of a legal duty to repair the fire alarm system, and the
case is one of common employment for the performance of a
special service for and in behalf of the city. The duty was
being performed through the instrumentality of private or

corporate agencies, and not through the fire department or its officers, or through officers of the city whose duty it was to perform such work; and it might be added that the work of repairing was an act ministerial in its nature. In a similar case [*Mulcairns* v. *City of Janesville*, 67 Wis. 24 (29 N. W. 565)], where the city was engaged in the construction of a cistern for the use of the fire department, and an employe was injured through the negligence of other employes, it was held that the city was liable, under the doctrine of *respondeat superior*; so, in *McCaughey* v. *Tripp*, 12 R. I. 449, where an employe was injured while the City of Providence was engaged in the construction of a city hall. See, also, *Donahoe* v. *City of Kansas City*, 136 Mo. 657 (38 S. W. 571); *City of Toledo* v. *Cone*, 41 Ohio St. 149. From these latter authorities we are impelled to the conclusion that corporate liability exists in the case at bar, and that the further and separate defense of nonliability was therefore properly stricken out.

5. Plaintiff's counsel contend that the statute settled the question at the very outset. But it only gives the action against the municipality when it is liable in its corporate capacity, as distinguished from its political or governmental capacity, as an arm of the state in the exercise of sovereignty: Hill's Ann. Laws, §§ 349, 350. So the question recurs, in what capacity was the city acting when the injury was sustained?

6. At the close of the testimony the defendant moved for a nonsuit, but without success, and error is predicated upon the action of the court in that regard. This necessitates a consideration of the testimony adduced, with a view to ascertaining whether the plaintiff proved a cause sufficient to be submitted to the jury. The basis of the action is the negligence of the city, its officers and agents, contributing as a proximate cause to the injury sustained by the plaintiff; and unless acts are shown from which negligence may be reasonably inferred in some particular, and attributable to the city in its corporate capacity, the case is not such a one as should be submitted for the jury's consideration. The Portland General Electric

Light Company was operating a system of electric light wires, extending north and south on the east side of Sixth Street where it intersects Yamhill, among which are what are known as "primary wires," carrying from ten hundred to twelve hundred volts of electricity, one of its poles standing immediately within the curbing at the southeast corner of Sixth and Yamhill Streets, and another south of that, about two-thirds of the distance across the block, near Mr. Corbett's barn. The Oregon Telephone Company had a system of wires on the west side of Sixth Street, one of the poles standing a little south of the southwest corner of Sixth and Yamhill; and the Columbia Telephone Company had a system extending east and west on the south side of Yamhill Street. The city had its fire alarm wires attached to the Columbia Telephone Company's poles, extending west on Yamhill Street to Sixth, at which point and from there south it was attached to the electric company's poles. Immediately prior to the time of the accident the superintendent directed that the city's wires should be changed in some particulars so as to avoid contact with some shade trees; and in obedience thereto a new wire had been attached along Yamhill, extending across Sixth Street, and attached to the Oregon Telephone Company's pole, and thence southward back across Sixth Street, and attached to the electric company's pole, near Mr. Corbett's barn, whereupon the old wire was cut near the engine house, or at Fourth and Yamhill, and again at the pole where the new one was attached, and the end thrown over into Sixth Street. Being detached from the electric company's pole at the southeast corner of Sixth and Yamhill, one of the workmen drove a staple into the top of the pole, with a view of keeping it off the electric company's wires while it was being taken down. The plaintiff, acting in his capacity as a groundman, and with a view to reeling it up at the same time, in conjunction with others, .attempted to take it down by pulling it through the staple from a point on Sixth Street near the curb on the east side where the end of the wire had fallen when cut. Finding the wire fast, the men with him let go,—one of them to go up

the pole to loosen it, and the others across the street, so as to get a view of the situation; but the plaintiff, continuing in his efforts to dislodge the wire, brought it in contact with one of the electric company's primary wires, resulting in his injury.

The plaintiff's account of the incident is, in substance, that he was at the time, September 28, 1897, and had been since July 13 preceding, in the employ of the city in the capacity of a common laborer to assist in changing the telephone and fire alarm wires; that his particular service was as a ground-man; that he was assigned to the duty of attending the reel and reeling up the wire as it came off the poles, and such other work as was necessary to be done on the ground, digging post holes, helping to set up poles, making connections on the ground, and dropping old wires when the insulation was off; that other men were working with him, namely, Cherry, Fisher, Schad, Baker, and Severian, the latter being the foreman of the gang; that after the wire had been cut he took his reel from the southwest corner of Sixth and Yamhill streets, where it then was, to where the end of the wire lay; that he, Baker, Cherry and Schad pulled on the wire until they found it was fast; that some one suggested that Cherry go up the pole, which he did, and Baker and Schad crossed over to the corner on the other side of Sixth Street, and that the witness, continuing in the effort to dislodge the wire, received a shock; that the wire was above the electric company's wires, and from where he was he could not see the point of contact with them, because of a tree which obscured his vision; that he did not understand, nor was he experienced as to the nature of, electricity; that he was perfectly ignorant of the danger of it; that neither the city nor its officers had ever given him any advice or instruction touching the danger of his employment, except on one occasion, some four or five weeks previous, when he was warned while adjusting a heavily insulated wire that he had better stand on some boards, as he was liable to get killed; that he had no previous warning by the city or its officers of the existence of the primary wires of the electric company, or that they were charged with electricity; that the

city had no rules for the government of laborers in performing their work, and did not furnish boards for them to stand on, or rubber gloves for them to use. On cross-examination he testified that the wire was a very old one, the insulation being off in places, and that he might have taken hold of it where the insulation was off, and that he had assisted in taking down a good many miles of wire.

H. H. Cherry testified that the electric company's wires were insulated primary wires, heavily charged, and used for distributing electricity about the city; that the plaintiff, Schad, Baker, and himself started to pull the wire down, when it caught somewhere on the pole; that he went up to take it loose, and the plaintiff was shocked; that he heard him make a noise, and saw the wire rocking,—saw it come in contact with the electric company's primary wire,—whereupon he took hold of it and lifted it clear; and that there was a bare connection with the primary wire. On cross-examination he stated that he did not recollect whether he cut the wire on Sixth Street, near Corbett's barn, or not, or whether Cullins, one of the men working in the gang, cut it, but whoever it was threw it over into the street; that the men, as a crew, had been taking down wires for about two months, and that plaintiff had been with them during the time; that it was his custom when he went up to unfasten these wires to look and see if they were going to come in contact with primary wires; that a man would recognize such things; that he knew there was a primary wire there when he unfastened the wire in question and took it off the insulator; that he put a staple in the top of the pole somewhere, and the wire came through, and the men pulled against it; that they could just as well have cut the wire at the pole as not; that the men used their own judgment as to where they should cut the wires; that they were supposed to work under Mr. Severian's orders, and that, if he told them to cut the wires in a certain place, it was done; that Severian was working with the men under Mr. Paddock, the electrician; that Paddock gave the general orders, and the men, under Severian's orders, would execute them; that at

the time he fastened the staple he thought it was the best way
to keep this wire off the primary wire of the electric company,
but it did not suffice for .the purpose; that all he had to do
when he went up the pole the second time was to lift the wire
off the primary wire; that, to the best of his recollection, the
covering of the wire was carried up in a bunch at the staple,
and that when this was taken out and cut off the wire was
pulled down over the primary wire; that the staples used
were big, strong staples; and that he used the one on that
occasion according to his best judgment to keep the wire from
coming in contact with the primary wire.

R. G. Paddock testified that he was superintendent of the
fire alarm and police signal wires in the city; that he hired
all the men, subject to the action of the board of fire and po-
lice commissioners; that he was given authority by these
boards to hire such men as necessity required; that no rules
had been promulgated requiring the wires to be cut where
crossing primary wires, or the electric company to turn off its
electricity, nor were there any boards or rubber gloves fur-
nished for the use of the men; that rubber gloves, being non-
conductors, were designed to protect the men from receiving
a shock from a heavily charged wire, or one carrying a great
voltage; that under certain circumstances boards are noncon-
ductors; that all these things are relative, depending upon the
voltage; that a dry board is a nonconductor; that if a person
is standing on a dry board, and the voltage is comparatively
low, the board will act as an insulator, the same as glass, and
that one thousand volts is comparatively low, nowadays,—
speaking generally, a dry board, or a piece of dry carpet, or a
piece of paper or glass, are all considered nonconductors (in
other words, they are very poor conductors of electricity);
that none of them are strictly nonconductors, but are rela-
tively high in resistibility, and that if a person would get on
some dry boards or a piece of paper, or a piece of dry rubber,
or anything like that, he could handle a thousand volts with-
out danger; that the matter of putting up and taking down
these wires was largely a matter of detail with the workmen

themselves; in some specific cases, Severian or witness would give special instructions, but, as a general proposition, the cutting or handling of the wires was a matter of detail with the crew.          Other witnesses were called, but this is the practical effect of the testimony, and there is nothing to dispute it.          It is at once apparent from this testimony that the acts immediately contributing to the injury of the plaintiff were the acts of Cherry or Cullins in cutting the wire at the pole near Corbett's barn, and casting it into the street across the primary wires of the electric company, and the act of Cherry in securing it to the top of the pole in such a manner as to allow it to come in contact with such primary wires.          Further than this the act of the plaintiff and the workmen with him in attempting to pull the wire through the staple from the position where the end of it fell, instead of taking it across the street opposite the pole where it was fastened, may have been a contributing factor.          Cherry says he used his best judgment in attaching the staple so as to have the wire come off clear of the primary wires, but failed in his purpose, possibly because of the position of the plaintiff in doing his work.

But, waiving this feature of plaintiff's position, it is clear that the person who cut the wire and threw it into the street across the wires of the electric company, and Cherry, who endeavored to make it fast to the top of the pole to which the primary wires were attached, so as to avoid contact with them, were fellow servants with the plaintiff, and he is precluded from recovery on that account, unless the city has been derelict in its duty, by not taking proper precautionary measures looking to the safety of its employes, whereby the plaintiff's injury ensued, without the concurrence of his own acts or those of his fellow servants contributing thereto.          As to who are fellow servants and who is the master, has been substantially settled by this court in *Mast* v. *Kern*, 34 Or. 247 (5 Am. Neg. Rep. 88, 266, 54 Pac. 950, 75 Am. St. Rep. 580),* wherein it was said

---

*NOTE.—See with this case a monographic note, Who is a Vice Principal.

See, also, 50 L. R. A. 417, for a long note, What Servants are Deemed to be in the Same Common Employment, Apart from Statutes, Where There are no Questions as to Vice Principalship.

(MR. JUSTICE BEAN announcing the opinion of the court): "The true test in all cases by which it may be determined whether the negligent act causing the injury is chargeable to the master, or is the act of a coservant, is, was the offending employe in the performance of the master's duty, or charged therewith, in reference to the particular act causing the injury? If he was, his negligence is that of the master, and the liability follows. If not, he was a mere coservant, engaged in a common employment with the injured servant, without reference to his grade or rank, or his right to employ or discharge men, or to his control over them. In short, the master is liable for the negligence of an employe who represents him in the discharge of his personal duties towards his servants. Beyond this he is liable only for his own personal negligence." Paddock was the city electrician and the superintendent of the alarm system. He directed the work to be done, and the men under the immediate direction of Severian, as his assistant, were engaged in the service. The linemen used their judgment as to the matter of detaching and taking the wires down, and it was not the master's duty to give specific directions touching the details of the work. Whoever attended to that while engaged in the particular capacity was a fellow servant with the plaintff, and not a master or vice principal. It is the duty of the master, however, to adopt needful and reasonable rules and regulations for the government and protection of his agents and servants while pursuing their employment; to exercise suitable care and precaution to provide them with a reasonably safe place in which to work, and fit and safe tools and appliances to work with, and to employ suitable and competent fellow servants; and such duty cannot be delegated in any manner so as to shield him from responsibility. Whoever performs this duty performs the master's duty, and, if he is not the master himself, he becomes a vice principal, and the master is still responsible.

7. Now, plaintiff insists that is was the duty of the city to have adopted rules and regulations which, among other things, should have required the wires that were being detached and

removed from the poles to be cut wherever they crossed a primary wire, or the electricity to be turned off the primary wires while the employes were at work in proximity thereto. It may be predicated of the employment in which the plaintiff was engaged that it was dangerous and hazardous, as it is common knowledge that electricity is a dangerous element, and those engaged in and about the instrumentalities and appliances by which it is handled and utilized in any considerable voltage are liable to come in contact with it and be injured. As a general rule, the dangers connected with such a business, that are unavoidable after the exercise by the master of proper care and precaution in guarding against them, are risks incident to the employment, and are assumed by those who consent to accept employment under the circumstances. Such dangers, however, as are known and can be mitigated or avoided by the exercise of reasonable care and precaution by those engaged in the business are not perils which the employe must encounter as incident to the business, and the master is generally held to accountability for his neglect in this regard contributing to the injury of the servant. "In other words," says Mr. Chief Justice Ruger in *McGovern* v. *Central St. R. Co.* 123 N. Y. 280 (25 N. E. 373), "it is the duty of the master, having control of the times, places, and conditions under which the servant is required to labor, to guard him against probable danger in all cases in which that may be done by the exercise of reasonable caution." See, also, *Anderson* v. *Inland Teleph. & Tel Co.*, 19 Wash. 575 (53 Pac. 657, 41 L. R. A. 410).

In this connection it should be observed that, although this duty is imposed upon the master, his neglect of it will not always render him liable as against a servant who engages in the employment with full and explicit knowledge of the master's default. The rule is stated thus by Mr. Justice Devens in *Leary* v. *Boston & Alb. R. Co.* 139 Mass. 580, 584 (2 N. E. 115, 52 Am. Rep. 733): "The servant assumes the dangers of the employment to which he voluntarily and intelligently consents, and while ordinarily he is to be subjected

only to the hazards necessarily incident to his employment, if he knows that proper precautions have been neglected, and still knowingly consents to incur the risk to which he will be exposed thereby, his assent dispenses with the duty of the master to take such precautions.'' It is probably best grounded upon the idea that where two negligent acts conduce to an injury, responsibility attaches to the one that stands as the proximate or immediate cause; and in such a case the servant cannot hold the master responsible, although culpable, because his own negligence is the direct and immediate cause of his injury. *Stager* v. *Troy Laundry Cb.* 38 Or. 480, 486 (63 Pac. 645, 53 L. R. A. 459); *Fitzgerald* v. *Connecticut River Paper Co.* 155 Mass. 155 (29 N. E. 464, 31 Am. St. Rep. 537). The question whether the defendant was at fault in omitting to adopt suitable rules is not one for the jury, unless there is something in the testimony from which the inference may be drawn that it was practicable to have provided against the occurrence of the accident complained of by such a rule. The court say in *Texas & N. O. Ry. Co.* v. *Echols,* 87 Tex. 339, 343 (27 S. W. 60, 28 S. W. 517): ''Whether or not the evidence is sufficient to show a case in which the duty to make rules rested upon the defendant is a question of law for the court. If the facts raised that issue, it should have been submitted to the jury; otherwise it should not.'' It may occur that the necessity and propriety of making and promulgating rules in a given case are so obvious as to make the matter one of common experience and knowledge. Such a condition would warrant a submission of the question as to whether the defendant was at fault in omitting its duty in this regard to the jury without evidence. But that is not the case here. It is manifestly not a matter of common knowledge and experience that rules such as plaintiff suggests would be practicable, or even useful, in the prevention of an accident of the kind. If, notwithstanding they were in fact necessary and practicable, it was a matter susceptible of proof, by showing that other municipalities, companies, or persons engaged in handling electrical machinery and appliances for generating and util-

izing electrical currents had adopted and put into operation such rules, with serviceable results, or by the testimony of persons possessing peculiar skill and experience in the construction, repair, management, and operation of such machinery and appliances. No such proof is to be found in the record, and hence a case has not been made in this particular upon which to put the question of negligence of the defendant in omitting the adoption and promulgation of the rules insisted upon to the jury: *Berrigan* v. *New York, L. E. & W. R. Co.* 131 N. Y. 582 (30 N. E. 57); *Morgan* v. *Hudson River Iron Co.* 133 N. Y. 666 (31 N. E. 234); *Atchison, T. & S. R. Co.* v. *Carruthers,* 56 Kan. 309 (43 Pac. 230); *Whalen* v. *Michigan Cent. R. Co.* 114 Mich. 512 (72 N. W. 323).

8. Plaintiff did attempt, however, to establish the practicability and necessity therefor, but says he was not permitted to do so because of the objection of defendant's counsel, and he insists that defendant cannot now complain of error which it invited. The rule sought to be invoked is a wholesome one, authoritatively established: Elliott, App. Proc. § 630; *Jobbins* v. *Gray,* 34 Ill. App. 208, 218; *Insurance Co. of Penn.* v. *O'Connell,* 34 Ill. App. 357, 360. A witness was asked what he would say as to the necessity of having some rules adopted in regard to performing the work, and this question he was not allowed to answer. It does not appear that he was a person skilled touching the matter of inquiry, so that no error was committed in the ruling upon the objection, and no error could be invited where the objection was well taken.

9. As to the other inquiry, touching the adoption of rules by other companies for the doing of that class of work, the question put and rejected does not reach the point, as it was not confined to the specific rules which plaintiff insists should have been adopted for the prevention of the accident. That other companies had adopted rules generally for the regulation and doing of the class of work being done by the city was too general to be of any practical avail. This constitutes the effort made in that behalf, and we find no error of the court respecting it.

10. Beyond this, however, we are of the opinion that, so far as developed by the evidence in this case, the cutting of wires, and the places where they should be cut so as to take them down conveniently and with the least danger to the workmen, are details of the work, which were for the judgment, discretion, and control of the workmen themselves, and not for the master to regulate by the adoption of rules for their guidance: *Ulrich* v. *New York Cent. & H. R. R. Co.* 25 App. Div. 465 (51 N. Y. Supp. 5); *Golden* v. *Sieghardt,* 23 App. Div. 161 (53 N. Y. Supp. 460).

11. With reference to furnishing the workmen with boards and rubber gloves for their use, this may or may not have been the duty of the city. But however that may be, it is a conceded fact that plaintiff worked two months and a half without them, and it is absolutely shown that he still continued in the employment, knowing the hazards attending the work, and he must be deemed, therefore, to have assumed the risk. His negligent act in continuing in the work became the proximate cause of the accident, hence he cannot recover upon that account.

12. Plaintiff says, also, that he was ignorant of the danger of electricity, and was not warned by any officer of the city that the electric company's wires carried electricity in dangerous quantities. But he was a man *sui juris,* of mature years and judgment, not laboring under any mental disability; and his admissions show that he had been previously warned by Cullins, a fellow servant, of the danger of being killed while in the same service in proximity to the electric company's wires where they carried 5,000 volts; that he heard two fellow servants say that they had each received shocks while in the same employment, and witnessed the effect of electricity on a horse, communicated by a sagging wire; and he must necessarily have known, as Cherry, Cullins, and other fellow workmen knew, not only the dangerous character of electricity, but the nature and condition of the electric company's wires. From his testimony there can be but one opinion touching the matter, and that precludes him from gainsaying knowledge

of the danger of electricity, and of the hazards he was incurring while engaged in the service. Under these conditions, there was error in refusing the nonsuit.

Other testimony was offered in the further progress of the trial, but no new features of the case were developed, and nothing shown that would be curative of the matters pertaining to the inquiry. The judgment of the trial court will therefore be reversed, and the cause remanded for such further proceedings as may seem appropriate, not inconsistent with this opinion.

Mr. CHIEF JUSTICE BEAN concurs in the result.

REVERSED.