Argued May 10, reversed and remanded June 13, petition
for rehearing denied July 30, 1974

## STATE OF OREGON, *Respondent, v.*
## DAN JAY HALL, *Appellant.*
### 523 P2d 556

*Robert C. Cannon,* Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*Robert E. Brasch,* District Attorney, Coquille, argued the cause and filed a brief for respondent.

Before O'CONNELL, Chief Justice, and DENECKE, HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

O'CONNELL, C. J.

Petitioner was indicted under ORS 167.207 for possession of more than one avoirdupois ounce of marijuana. Petitioner pleaded not guilty, was tried before a jury and convicted. The Court of Appeals rejected petitioner's claim that the trial court erred in admitting certain evidence and affirmed the conviction. *State v. Hall,* 14 Or App 629, 514 P2d 361 (1973). A petition for review was then filed, which we granted.

This prosecution grew out of a drug raid by seven police officers on a four-bedroom house located in

Coos Bay, Oregon. The raid was made under the authority of a search warrant. Petitioner, clad only in blue jeans, answered the door when the police knocked, but denied them entrance when he was informed of their identity and purpose. The officers forced their way into the home and discovered eight adults in the living room. The police presented the warrant to Mr. and Mrs. Clyde Spikes, having previously learned that the telephone company had listed the Spikes as residents of the house. Petitioner demanded to see the warrant, stating, "I live here, too." Petitioner and the others were ordered by the police to sit down. Petitioner sat down on a couch in the living room. His movements were described by one of the officers as follows:

"Q Did you see him do anything as he sat down?

"A Yes. As I entered the door, there was a small plastic bag that was on the couch; and when Mr. Hall sat down, he sat directly on top of this bag.

"Q And did you see him do anything after he sat on the bag?

"A Well, he just sat down on it.

"Q Did he do anything with it after he sat on it?

"A I asked him if he would please remove himself from the bag, which he did.

"Q Did he do anything with the bag? Did he ever remove it from the couch?

"A Yes. He got off the bag, moved over a little bit, reached down and threw it on the floor.

"Q Did he say anything when he did that?

"A Yes. He asked the question, 'What is this shit?'

"Q After this bag was thrown on the floor, did you ask him to do anything with it?

"A I asked him if he would put it back on the couch where it was before this, and this he did do.

"Q  Did you later seize this bag yourself?
"A  I did."

The bag contained 34 grams of marijuana.[1] The officer also testified:

"Q  Now, Officer, as you were in the living room marking the evidence, did you ever overhear a conservation between the people in the living room — when I refer to the people, I don't mean the police officers that were there — the other persons in the house when you entered?

"A  Yes. After the bag was placed back on the couch by Mr. Hall, he made the statement of, 'I'm sorry I brought the lid in.'

"Q  Now, 'lid,' are you familiar with that term?
"A  I am.

"Q  And what does that term mean?

"A  A lid usually refers to a plastic bag which is like Exhibit Number Twelve. It signifies a quantity of marijuana."

On another occasion during the evening, one of those present asked the police if could use the bathroom. When he was told that he could not do so, petitioner said, "Go ahead and go. It's my house too."

During the course of the evening a complete search of the house was conducted. A search of the west upstairs bedroom, occupied by Mr. and Mrs. Spikes, uncovered 95 grams of marijuana. In the east upstairs bedroom, occupied by petitioner, the police found four grams of marijuana seeds, a partially burned marijuana cigarette, a scale with marijuana residue on it, and a number of plastic bags. In the dining room the police seized 51 grams of marijuana which was packaged in four plastic bags. The bags were in what

---

[1] One avoirdupois ounce is equivalent to 28 grams.

appears from the police photographs to be a shoe box which was covered with decorative paper. The box was on an ironing board in the dining room, which was adjacent to the living room. Resting next to the box on the ironing board were a woman's purse, two women's hairbrushes, a cigarette lighter and a package of Vicks cough drops. The purse belonged to one of the girls in the party. The police removed some yellow capsules from the purse.

Petitioner was placed under arrest and directed to get dressed. Accompanied by a police officer, he went to the upstairs east bedroom where he obtained socks and a shirt. At that time he was asked if that was his bedroom and he answered, yes. Petitioner was then taken to Coos Bay police department headquarters for booking. Petitioner gave as his address the street number of the raided residence.

Because petitioner was convicted of possessing more than one ounce of marijuana, the central issue presented by this case is whether there was sufficient evidence to establish at least this amount of marijuana in his possession. The trial court admitted into evidence all the marijuana found in the house. Petitioner concedes that the four grams found in his bedroom was properly admitted, but he asserts that it was error to admit the marijuana found in the west bedroom and the marijuana found in the dining room. In addition, he claims the trial judge erred in admitting certain testimony to establish that the amount found in his possession in the living room consisted of more than one ounce.

■ On oral argument, the state conceded that the 95 grams of marijuana found in the west bedroom was

erroneously admitted. This concession was well warranted. The evidence was uncontroverted that the west bedroom was occupied by the Spikes. Nothing produced at trial indicated that petitioner had any right of access to this room, nor that he had actual or constructive possession of the marijuana in that room.

■ This conclusion alone requires reversal because we cannot be certain that the jury did not rely on this evidence in finding petitioner guilty. However, because the case is to be remanded for a new trial, we deem it essential to consider the other issues raised by petitioner.

As noted above, petitioner was found in actual possession of a baggie containing 34 grams of marijuana. However, the state's evidence established that not all of the contents of the baggie was illegal.[2]

The state's evidence established that some of the marijuana found in the bag was of the illegal variety

---

[2] Both ORS 167.202 (1) and ORS 474.010 (13) define marijuana to include legal material. ORS 167.202 (1) provides:

"As used in ORS 167.202 to 167.252, unless the context requires otherwise:

"(1) 'Apothecary,' 'coca leaves,' 'dispense,' 'federal narcotic laws,' 'manufacturer,' 'marihuana,' 'narcotic drugs,' 'official written order,' 'opium' and 'wholesaler' have the meaning provided for those terms in ORS 474.010."
ORS 474.010 (13) provides as follows:

"(13) 'Marihuana' includes all parts of the plant Cannabis Sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant, and every compound, manufacture, salt, derivative, mixture or preparation of such plant, its seeds, or resin; but shall not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil or cake, or the sterilized seed of such plant which is incapable of germination."

and some of it was not. A state police lab technician, Bart Reid, a chemical expert, testified over objection that he made a visual inspection of the contents of the bag and determined that approximately five of the 34 grams "would be exempt under the statute." This left 29 grams of illegal matter which Reid testified would be found in the bag.

■ We are of the opinion that the trial court erroneously permitted Reid to express this opinion. While it was stipulated that he was a "chemical expert," this merely qualified him to identify the substance as marijuana. Nothing in the record establishes that he had any special ability to determine proportionate weights of the various component parts of a substance by sight. Reid did testify that he had frequently made field estimates of the *total* weight of the contents of a bag of marijuana and that in general he found them to be "slightly lower than the actual weight."[9] However, on cross-examination, he testified as follows:

"Q  In arriving at these comparisons in the past, have you ever actually separated them and weighed the stems versus the vegetable material so that you can check your calculations?
"A  No, I have not."

■ It is elementary that before an expert opinion

---

[9] On the other hand, the following transpired on cross-examination:

"A  Well, as I've stated before, I try to be conservative in my estimates. I have on occasion been high on my estimates; but as a general rule, I've been low.

"Q  But, there could be some error in your estimate, is that correct?

"A  Yes, I've made an estimate in the field and then examining the evidence in the laboratory have found myself to be a little bit higher than what I'd estimated, and the weight had been a little bit lower than what I estimated."

may be offered by a witness, he must be shown to possess special skill touching upon the matter of inquiry.[*] Here no such skill was demonstrated, and therefore the trial court erred in admitting this testimony.

■ With respect to the 51 grams of marijuana found in the dining room, petitioner asserts that the evidence was insufficient to establish that he had possession of it. We agree. It is true that from petitioner's possession of the scales and the plastic bags, it could be inferred that he packaged the marijuana found in the dining room and that initially, at least, he had possession of the four bags of marijuana found there. And in the absence of other evidence, it could also be inferred that the packaged marijuana was placed in the dining room by the petitioner awaiting disposition by sale or otherwise. But there was other evidence from which an inference of equal strength could be drawn that the 51 grams of marijuana were not in petitioner's possession. The marijuana found in the Spikes' bedroom was also packaged in plastic bags and therefore it could be inferred that the marijuana found in the dining room was theirs or had been placed there by them. When the police arrived, it appeared that all those present had been smoking marijuana. The juxtaposition of the box of marijuana, the woman's purse, the hairbrushes, the cigarette lighter and the package of cough drops permits an inference that the marijuana belonged to the owner of these other articles on the ironing board. These inferences are in equipoise and there are no other facts which would aid the jury in deciding whether to draw one inference or the other. Under these circumstances, the submission to the jury of the question of petitioner's possession would simply invite jury specu-

[*] See Wagner v. Portland, 40 Or 389, 60 P 985, 67 P 300 (1902).

lation. In the absence of other evidence showing a connection between petitioner and the 51 grams of marijuana found in the dining room, we find it necessary to say as a matter of law that the state has not met its burden of proof.

Reversed and remanded for a new trial.