ing party to its terms and the procedure under it, which would deprive him of a right to move the courts against his partners in the illegal action. Unckles v. Colgate, 72 Hun, 119, 25 N. Y. Supp. 672; Id., 148 N. Y. 529, 43 N. E. 59. The demurrers are sustained, with costs, with leave to amend the complaint within 20 days, on the payment of costs.

Demurrers sustained, with leave to amend complaint.

---

## NILES v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. February 9, 1897.)

1. MASTER AND SERVANT—DEFECTIVE APPLIANCES—EVIDENCE.

Negligence cannot be predicated on the failure of a railroad company to maintain a semaphore in good condition, where a rear-end collision resulted from failure to give the danger signal before the overtaking train passed the semaphore, but there is not sufficient evidence to sustain a finding that the semaphore operator attempted to give the signal before the train passed.

2. SAME—RULES FOR PROTECTION OF SERVANTS.

A railroad company is not chargeable with negligence in failing to make rules for the management of trains during severe and long-continued snowstorms merely because it had made a special rule in respect to the operation of trains in foggy weather.

Appeal from trial term, Oneida county.

Action by Adaline Niles, as administrator of Charles H. Niles, deceased, against the New York Central & Hudson River Railroad Company, to recover damages for the death of plaintiff's intestate. From a judgment entered on a verdict in favor of plaintiff, and from an order denying a motion for new trial, defendant appeals. Reversed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and GREEN, JJ.

C. D. Prescott, for appellant.

I. J. Evans and E. D. Lee, for respondent.

GREEN, J. This action was brought to recover damages for the alleged negligent killing of the plaintiff's intestate, Charles H. Niles. The deceased had been in the employ of the defendant for 38 years, in different capacities, and at the time of his death was the conductor of a work train. February 9, 1895, was a stormy day, and had been preceded by two or three very stormy, snowy days. The snowstorm was accompanied by high winds, and the air was filled with blustering, blowing, and falling snow, making drifts on the tracks. Men were engaged east of Oneida in clearing the tracks of the snow, and Niles was directed to take the work train and proceed east to Rome and pick up the men that were down there at work. The Niles train left Oneida at 4:30 p. m., and the fast-freight train passed through Oneida at 4:34½ p. m., and passed under the tower just east of Oneida at 4:35½. The engine drawing the Niles train was run backward,—that is, the tender was in advance of the engine,—and it was so greatly

impeded by the heavy snowdrifts that it was obliged to slow up several times. The train became stalled in a snowdrift somewhere about 100 feet east of the Verona block-signal tower, and about 600 or 700 feet west of Verona station. Gilkerson, the engineer, says that he thought 25 to 30 miles an hour was his average run between the block towers. When the fast freight reached the Oneida tower the signal was at "Danger," indicating that there was a train ahead in the block, but the towerman motioned to the engineer to proceed; and as the engine passed under the tower he attempted to throw a "caution card" to the engineer from the tower, but the wind blew it away, and he failed to get it. But he says that he understood it was a card authorizing him to proceed into the block, with the understanding that there was a train ahead of him, and that he must run to the next signal with the train under complete control, expecting to overtake the preceding train. Klein, the engineer of the freight train, says: He had no idea how fast they were running. "The snow was very deep, and we couldn't go very slow. We had to go to keep our train going. We went between those towers not over fifteen or sixteen miles an hour. It might have been a little more or less." That when he passed the semaphore, or station signal, he reduced the speed to about 10 miles an hour, as he knew he was within 1,200 feet or so of the tower. He states that he could stop the train in between 500 and 600 feet, but again he says that, if Niles had sent a flagman back, it would have been necessary to go back between 600 and 700 feet. Being asked why he failed to stop at the tower, but went through it at that rate of speed, he answered: "At the time we approached Verona, the snow was quite heavy there, and, to come right down to a full stop before we came to the tower, we would have got stalled. We never would have got out, likely. So we run through the tower." According to his testimony, the train reached the tower at 4:45½ p. m., making the run of 3.81 miles in 11 minutes, or at the rate of about 23 miles an hour.

In order to avoid the imputation of contributory negligence on the part of Niles in not obeying the requirements of rule 95, which provides that the brakeman shall go back instantly when a train is stopped, and that the conductors will be held responsible for the enforcement of this rule, the respondent's counsel contends that the evidence sufficiently shows that the brakeman acted with due promptness in preparing to go back and flag the approaching train, but that it came upon them so quickly that no time was allowed for the fulfillment of the rule; that the fast-freight train proceeded at a high rate of speed,—from 15 to 25 miles an hour,— and the jury was warranted in finding that the work train and the freight arrived at Verona tower at about the same time, the freight train having only about 4 miles within which to overtake the other, which had preceded it but 5 minutes ahead. Assuming this to be true, then we are unable to perceive any force in the contention that negligence may be predicated upon the failure of

the company to properly inspect and maintain the semaphore, and that such omission was the proximate cause, or one of the proximate causes, of the accident. It is insisted that the lever failed to operate the semaphore, for the reason that it was not properly inspected and kept in working order, and that, if it had been, the semaphore would have been at "Danger," the engineer would have seen it, and no accident would have occurred. There is no evidence that the semaphore was out of condition, and the witness Lorenz, who had charge of and operated it, testified that it was not out of order, and that it stood at "Danger" shortly after the accident. This argument is based upon the assumption that the freight train passed the semaphore after Lorenz had operated the lever, and, as the semaphore was down, it had failed to respond to the working of the lever, because it was out of good condition, and that this was a contributing cause of the accident. But, upon the respondent's theory of the case,—based upon some evidence to support it,—we fail to perceive any evidence, for the consideration of the jury, upon which it would have been warranted in finding as a matter of fact (if it really did so find) that Lorenz had worked the lever before the freight train had reached the semaphore. Lorenz testified that, after he heard the work train coming, he walked from the shanty south of track No. 1 to track No. 4, a distance of from 50 to 100 feet, and, after he saw it had come to a standstill, he went and threw the lever, which stood 120 feet east of the crossing. Sherman corroborated him as to doing this. Klein, plaintiff's witness, testified that, based upon his own experience, a man ought to walk from 125 feet to 140 feet per minute, under the conditions as they were on this day. According to Rahn's story, after he was aware of the stoppage of the work train, and after he was informed of the approach of the freight train, he went the length of the car (30 feet), got his flag, went back halfway (20 feet), tried to get out at the side door, and then went to the front end of the car, before they were struck. He must have gone some 70 feet. Now, if the train came upon them so quickly that Rahn was unable to get out of the car with his flag,—he acting with due promptness in the emergency,—is it probable that Lorenz had reached the lever and worked it before the freight train had reached the semaphore, some 1,600 feet distant from the point of collision? It would seem that a minute or more elapsed before Lorenz reached the semaphore. Where was the freight train then? If we take Rahn's testimony, it was right upon them, and within the semaphore; and, if that be true, it was immaterial to the case that the semaphore was out of condition. This semaphore, or station signal, was 1,500 feet west of the tower, but was no part of the block system of signals, and had reference only or principally to the use of the tracks at the station. Now, if we assume that the semaphore was 1,500 feet west of the tower, and 1,600 feet west of the work train, and the freight was running 10 miles an hour, and a minute elapsed between the stoppage of the work train and the time of collision, and it took Lorenz

43 N.Y.S.—48

a minute to reach the lever, then the freight train must have been 880 feet distant from the point of collision, or 720 feet within the semaphore, when it was operated. If the rate was 15 miles per hour, it was 1,320 feet distant, or 280 feet within the semaphore.

Without undertaking to raise and solve further problems, it is sufficient to say that, if we accept the respondent's theory of the case, the jury must have acted upon the veriest surmise or conjecture in determining that, as a matter of fact, the freight train passed the semaphore after Lorenz had attempted to place it at "Danger." And it is very difficult for the court to say that the jury adopted the respondent's theory, and founded its verdict upon evidence (?) of so vague, uncertain, and unsatisfactory a character. If negligence is to be imputed to the company in not inspecting and maintaining the semaphore in proper order and condition, and this was a proximate cause of the injury, it is incumbent upon the plaintiff to establish it by the production of some fair and reasonable evidence, and not leave it to mere supposition or conjecture. If, on the other hand, the evidence given by the appellant's witnesses is to be accepted as true, then it appears that Niles' train had been stalled from 4 to 7 minutes before it was struck, and he was chargeable with a violation of the rules, and imputable with negligence. Upon all of the evidence, taken together, we cannot say that the jury was not justified in disbelieving the witnesses, or any of them, that the work train had been stalled even 4 minutes. The work train had departed but 5 minutes ahead, but the engineer must, we presume, have acted upon the assumption that the time was 10 minutes, and run his train accordingly. To traverse about 4 miles in 11 minutes required a speed of about 23 miles per hour, and the freight must have been running considerably faster than this work train, although the engineer of the latter says he thought he was running at from 25 to 30 miles per hour, and was obliged to slow up once or twice on account of the snowdrifts. If, as it is claimed, the signalman at the Oneida tower allowed the freight train to follow the work train 5 minutes after the latter had passed through, that was an act in direct violation of the rules prescribed. By the "caution card," which the engineer understood, he was authorized to proceed into the block, running cautiously and with his train under complete control, with the expectation of overtaking the preceding train in the block. He was not authorized, but, on the contrary, was expressly prohibited by the rules from passing, under any circumstances, the next signal at "Danger," except in specified cases, not required to be mentioned. Since the Verona block was closed to the freight train, and the collision there occurred, it would seem to be a matter of no great importance, in determining the liability of the company, that 10 minutes was not allowed to elapse between the departure of the trains; for the train following was precluded from passing the tower, and especially at the rate of speed it was going. If the 10 minutes had elapsed, and the freight had overtaken the work train before Niles had had sufficient opportunity to flag it, the

collision would nevertheless have occurred; for, according to Klein's statement, it would have taken about 600 feet to stop the train. So that, whether 5 or 10 minutes had intervened, the collision would have occurred, even though the work train had been stalled several hundred feet east of the tower, though, perhaps, it might not have resulted in Niles' death. The fact of the matter appears to be, therefore, that Klein had no intention of stopping at the tower, or of passing it at a low rate of speed, but his purpose was to run through it 500 or 600 feet, which would bring him within 200 or 300 feet of the station. Because the station signal or semaphore was down, and indicated a clear track to the station, he relied mainly upon that, and ignored the presence of the tower, in so far as he had any intention to stop or slow up there. His purpose was to run 500 or 600 feet beyond it, if, on arriving close to the tower, the danger signal should be up. In other words, he knew the speed of the train would take him that distance beyond the tower. Klein, the engineer, admits that, as he understood the rules, the freight train was bound to stop, if he could not see or tell whether the tower signal was at "Danger"; that, if for any reason he could not tell whether the danger signal was exhibited or not, he was bound by the rules to stop. He admits that he knew that he was in the vicinity of the tower; says that he watched for it, but did not see it, and could not, by reason of the blinding storm, until he was almost under it, and within 100 feet of the rear end of the Niles train, and as soon as he saw it he shut off steam. Evidence was given to the effect that most of the time it was impossible to see a distance of 300 yards, and at times you could not see 300 feet, and the respondent's counsel makes endeavor to excuse the engineer on that account for violation of the rules. He knew when he reached the station signal that the tower was but 1,500 feet away, and the time it would take to reach it, and he must also have known that his vision of the tower signal was greatly obscured by the storm. The conditions of the weather, instead of being an excuse or in palliation of his conduct in violating the governing rules, really necessitated greater caution and circumspection in the running of the train. Then, again, he must have known that men were engaged in clearing the tracks from the heavy fall of snow, and that the preceding train might be, and very likely was, a work train, going at a comparatively low rate of speed. If the train had been kept under complete control, and bearing in mind that his view of the tower signal was greatly obscured, the collision would not, it is very probable, have resulted as disastrously to Niles. The force of the collision indicates that the train must have been running at a pretty rapid pace. The state of the weather, the storm, and the circumstances existing, forbade the engineer from attempting to run 500 or 600 feet beyond the tower. Because he could not see the tower signal until he was close upon it did not warrant or justify him in passing through at the rate he did. His duty was to approach it slowly and cautiously, as required by the rules and instructions.

It is also urged by the respondent's counsel that the company owed a legal duty to its employés to erect distance signals on freight tracks as well as on passenger tracks, and which are operated in connection with the tower signals, so that when the latter are placed at "Danger" the former would also exhibit the danger signal. These distance signals are placed on passenger tracks some 1,600 to 2,200 feet away from the tower. If they had been erected on the freight tracks, the accident would not have occurred. The reason they are erected on passenger tracks, and not on the others, is, it is stated, because of the greater rate of speed of passenger trains, and the same necessity does not exist as to freight trains. However, both Niles and Klein were conversant with the system of track and train signals, and all the rules appertaining thereto. Since Klein knew that there was no distance signal, how is its absence material on the question of the company's liability, under the circumstances of the case? Having such knowledge, and knowing that he could not perceive the tower signal until close upon it, was he not bound to govern his actions accordingly, and to keep his train under complete control while approaching the tower? If he had observed the "caution card," or if he had observed the tower signal, and stopped, or, being in doubt, had stopped, or proceeded slowly and cautiously, as required by his instructions, the injury would not have resulted. The block signal being at "Danger," preventing the passage of freight trains, if observed, the absence of a distance signal was not material. It may be contended that, as the freight train was obliged to run through the tower at a good pace to avoid being stalled in the snow, the company was negligent in not providing additional precautions—such as distance signals connected with the tower—to meet this emergency. This snowstorm was almost unprecedented in length and severity, but it is claimed that the company should have foreseen and anticipated the happening of this contingency, and made special provision for it. But the true question seems to be whether the engineer was justified by any requirement of the company to take the chances of running into a preceding train, for fear of being stalled? How did he know but that the preceding train was stalled, if the danger of becoming so was so imminent? Suppose a distance signal was placed there, and the train ahead was stalled within the block; would he be excusable in running into it at such a rate of speed? Would not the following train also become stalled, even if it did not run into it? If the danger of becoming stuck in a snowdrift was so imminent, may not the preceding train have become stalled? Supposing the Niles train was stalled just west of the tower, and the station signal was down; would there not have been a forcible collision? Then he would not be warranted in relying upon the signal as showing a clear track to the station. What is the difference, therefore, whether it was just east or just west of the tower? Because of the presence of snow, necessitating increased speed, is the company liable for not furnishing a safe place? The company had promulgated the following rules, among many others:

"If on the arrival of a train on either track three or four at a block tower, the preceding train has not cleared the block, the signalman must hold train until ten minutes after the departure of preceding train, unless block should be cleared before the ten minutes have elapsed."

"If at the expiration of ten minutes the preceding train has not cleared the block, the signalman must give the engineer a caution card, authorizing him to pass the signal at danger, and proceed into the block already occupied. Engineer entering a block with caution card will be held responsible in case of an accident caused by wrecking the preceding train. These rules do not relieve conductors from the duty of promptly and properly protecting their trains. They will be held strictly responsible· for observance of rule 95.    In the absence of any signal the train must stop, and the cause of the failure to display the same must be ascertained.    Trains must under no circumstances pass signals at danger, except," etc.

"The use of block signals, and the rules governing the same, do not relieve employés in the train service from observing all other rules relative to the protection of their trains.    Conductors and engineers are particularly requested to note the location of the signal towers.    And they must take every precaution for the protection of their trains, even if not provided for by rules.    In all cases of doubt and uncertainty, take the safe course, and run no risks."

"Whenever a train of any class is stopped on the road, or detained at any regular station, from any cause, or is only able to proceed at a slow rate, the rear brakeman or trainman must go back instantly with a red signal at least one mile. This must always be done, whether another train is expected or not, and in carrying out this rule the utmost promptness is necessary.    Not a moment must be lost in inquiring as to the cause of detention or stoppage, or its probable duration." Rule 95.

"A train of inferior class must, in all cases, keep out of the way of a train of a superior class."

Niles' train was an extra, and of inferior class.

Plaintiff contends that the company was negligent in failing to establish and promulgate reasonably safe and sufficient rules for the management and control of its trains and engines during severe and long-continued snowstorms.    The ground urged in support of this contention is that, because the company deemed it necessary or expedient to promulgate a particular rule in respect to foggy weather, it owed a legal duty to its employés to extend such rule so as to make it applicable during the existence of unusual snowstorms, if, in the judgment of the jury, it would be practicable or feasible for that purpose, as testified to by certain witnesses.    In such case it is insisted that the jury has the right or .power to determine that the omission or failure to so extend such rule constituted negligence, and, in effect, to promulgate a rule of that character.    The rule referred to provides that in foggy weather, when a train cannot be seen at 300 yards, trackmen must suspend ordinary work, and patrol the track, acting as signalmen to warn trains of danger, should there be any.    It is argued that the same reason or necessity exists during the prevalence of blinding snowstorms, obscuring the engineer's vision of the track signals, and that the company was bound to require the trackmen, although the removal of the snow and the clearing of the track demanded their immediate attention, to abandon their work and to patrol the tracks in a blinding snowstorm.    A rule requiring the trackmen to tramp up and down through the deep snow while a severe storm is raging might be objectionable on humanitarian grounds, and it is not conceivable how negligence can be predicated upon the omission to establish a rule of that char-

acter. And especially so when it appears that the company has adopted an adequate system of signals for the guidance of those running the trains, and has promulgated an apparently complete system of rules or instructions to be observed, comprehensive in their scope and particular in their details. A careful observance of these rules by all of the employés would, it seems, prevent the occurrence of accidents; and it is because of the nonobservance of them, or some of them, by one or more of the employés, that collisions occur. We are unable, therefore, to perceive that it was competent for the jury to say that the omission to establish the rule "proposed" created a legal liability. The clearing of the track from snow was a matter of paramount importance, and demanded the particular attention of the trackmen; and it is insisted that they should have been required by rule to suspend their work, and to patrol the tracks, as signalmen, to warn coming trains of danger, if any there should be, and the absence of such a rule may, in the judgment of the jury, constitute a breach of legal duty and negligence. If, as it appears here, the movement of an engine and cars was impeded by the snowdrifts, there would be considerable difficulty for the trackmen to patrol the tracks. The contention is that the system of signals and the rules may be all right and proper enough in fair weather, but that it was for the jury to say whether they were reasonably safe and sufficient during a severe and long-continued snowstorm; in other words, that the jury was warranted in finding that the experienced officers of the company should have foreseen or anticipated that the tower signal might become so obscured by a snowstorm that the engineer could not perceive it, although he knew its location, and that he would be unable to do so, and was bound to stop, whether he could distinguish the signal or not, or that the engineer would be obliged, on account of snowdrifts, to run through the tower to avoid being stalled, and that, therefore, the company was bound to adopt some additional rule or precaution,—as, for instance, to require the trackmen to transform themselves into locomotive signal towers. Upon this lack of foresight in anticipating the happening of these contingencies and providing against them, negligence is predicated. These contingencies might, it is claimed, be reasonably anticipated as likely to occur, and a new rule was demanded; that in addition to the system of block tower signals and the station signals, and the system of rules pertaining thereto, the trackmen should have been required to suspend work, and transform themselves into signalmen, by a rule of the company. The doctrine imposing liability upon railroad companies for failure to adopt particular rules, the necessity for which was not apparent to them, should not be unduly or unreasonably extended. And since the company has a paramount interest in protecting its property from injury or destruction, and also in avoiding all liability for damages to employés and passengers, and the officers of the company deemed this system of signals and rules for the management and control of the movements of trains to be fully adequate for all purposes, these considerations must have some weight in determining

whether the omission to promulgate a particular rule constitutes a neglect of duty, in not being able to foresee certain contingencies. It is true that the trackmen could have been relieved from the work of clearing the tracks, by the employment of other men for that purpose, or by the assignment of other employés; but it is significant that Niles himself, an old and experienced employé, and knowing of the dangers to be apprehended from the storm more fully than others, deemed it unnecessary for the protection of his train, though much impeded by the snow, to adopt the precaution of dropping or sending back a trainman to warn any train that might be following. See rule 95.    And yet it is urged that the company itself was negligent in not requiring a precaution of that character during a severe snowstorm.    Evidently he believed that he was amply protected by the existing system of signals, and the rules governing the action, management, and control of any train that might be coming in his rear, and that the engineer would fairly observe them.    He supposed, undoubtedly, that the tower signal would protect him, and that the engineer would not attempt to run past it, and especially at a good rate of speed.    He relied upon the assumption that the towerman at the Verona tower would observe the rules, and hold the following train at least 10 minutes after the departure of his own.    A rule easily followed by servants, and, when followed, securing safety to co-servants, is a reasonable compliance with the duty owing by the company to them.    Obedience to the regulations of a railroad company in regard to the running of trains is a matter of executive detail, which neither the company nor any general agent can personally oversee, but as to which employés must be relied upon.    If those employés fail in their duty by breaking existing regulations, and in consequence other employés are injured, it will be deemed to have been caused by the negligence of fellow servants.    See Railroad Co. v. Cates (Ind. App.) 41 N. E. 712; Railroad Co. v. Tohill (Ind. Sup.) 42 N. E. 352.    Because the tower signal was in the vicinity of a station, and the station signal indicated a clear track to the station, was the engineer justified, by any implied requirement of duty to the company, under the circumstances and conditions existing, in ignoring the tower signal and other rules, and passing through the tower at a good rate of speed, to avoid being stalled? In view of the condition of the weather, was it a negligent omission to provide some additional precaution, as suggested by respondent? True, the station signal indicated a clear track; but that had no connection with the tower signal, and was no part of the system, and the engineer was prohibited from passing the tower under any circumstances.    Was the omission to erect distance signals, operated in connection with the tower, such an omission, in view of all the circumstances, as to render the company responsible for failure to furnish a "safe place"?

Upon the whole, we are of the opinion that the evidence is insufficient to establish negligence on the part of the company, and that the violation of the rules by co-employés, or their combined negligence, was the producing cause of the injury sustained.    Where reg-

760 NEW YORK SUPPLEMENT

ulations for the running of trains, which are proper and suitable, with a view to the safety of employés, are prescribed, obedience to these regulations by those having charge of a train is matter of executive detail, and for a disobedience of them which causes injury to a co-employé the master is not liable. Slater v. Jewett, 85 N. Y. 61. Whether the rules are best for the purpose, or the most complete, is not a proper matter for the consideration of the jury, where the injury was the result of the negligence of a co-employé, in violation of a rule prescribed for the particular circumstance. Corcoran v. Railroad Co., 126 N. Y. 673, 27 N. E. 1022. In Simpson v. Railroad Co., 5 App. Div. 614, 39 N. Y. Supp. 464, plaintiff's train was running on telegraph orders, and was entitled to the right of way; and he contended that, if a rule had been adopted that all trains should be kept off the main line while detained at stations awaiting orders, the collision would not have occurred. The court answered:

"So long as the rules promulgated will, if observed, secure safety, it is wiser to leave the making of the new rules to the company."

In Berrigan v. Railroad Co., 131 N. Y. 584, 30 N. E. 58, it was pertinently observed:

"It is easy enough, after an accident has occurred, to suggest how it might have been prevented. In the absence of proof of other roads having the proposed rule, or of persons possessing peculiar skill and experience in the management and operation of railroads, to the effect that such a rule is necessary, the court is not warranted in submitting such questions to the jury."

And in another case it was observed that:

"Even if it could be shown after the accident occurred that it might have been prevented by adopting and enforcing some suitable rule, that would constitute no proper test of liability." Morgan v. Iron Co., 133 N. Y. 666, 670, 31 N. E. 234, 236.

In my opinion, and for the foregoing reasons, the judgment herein, and the order denying the motion for a new trial, must be reversed, and a new trial ordered, with costs to abide the event of the action.

Judgment and order reversed, and new trial ordered, with costs to abide the event. All concur.