GASKA et al., Appellants, v. AMERICAN CAR & FOUNDRY COMPANY, Respondent.

St. Louis Court of Appeals, October 22, 1907.

1. **MASTER AND SERVANT: Safe Place to Work: Rules for Protection of Employees: Complex Business.** It is the duty of the master to prescribe rules for the conduct of his business, reasonably adapted to insure the safety of his employees, under certain circumstances, such as where the business is an intricate and complex one, in which different workmen have distinct tasks, and one group in the performance of its task is liable to endanger the safety of another engaged in a different task.

2. ———: ———: ———: ———. Where one gang of men was employed in a car and foundry company's shops repairing the draft timbers of cars and their duties made it necessary for them to work under the cars, and another gang of men was employed in tightening the truss rods on the cars which work made it necessary for them to jack up the cars so as to endanger men in the first gang while operating under the cars, which danger would be recognizable by common foresight, it was a question for the jury as to whether the business being a complex one there should have been some regulation for the protection of the men working under the cars.

3. ———: ———: ———: Negligence: Fellow-Servant. The failure of the master in such case to provide reasonable regulations to protect his employees is his own negligence and not the negligence of the fellow-servant through whom an injury occurs because of the absence of such regulation; if reasonable regulations are provided and an injury occurs through the negligent violation of them by a fellow-servant, the injury is due, not to the negligence of the company, but to that of a fellow-servant.

4. ———: ———: ———: Complex Business: Evidence. In an action by an employee against his employer for injuries received through the defendant's negligence in failing to promulgate rules for the protection of employees, with proper allegations in the petition, it was error to exclude evidence as to the extent and complexity of the defendant's business.

5. **DAMAGES: Death Claims: Aliens.** One is not disqualified on account of being a non-resident alien to maintain an action under the statutes giving damages to the next of kin of a deceased person who is killed by the fault of another.

Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher,* Judge.

REVERSED AND REMANDED.

*J. Hugo Grimm* for appellants.

(1) It was the duty of the defendant to protect its employees by the adoption and enforcement of a rule requiring the trussing crew to do their work only when the cars stood upon their trucks, instead of permitting them to do the work of trussing while the cars stood upon trusses. Eastwood v. Mining Co., 86 Hun 92; Gerrish v. Ice Co., 63 Conn. 16; McIlligoll v. Randolph, 61 Conn. 157; Jones v. Railroad, 178 Mo. 545; Foster v. Railroad, 115 Mo. 179; Rutledge v. Railroad, 123 Mo. 126; Reagan v. Railroad, 93 Mo. 348; Schroeder v. Railroad, 108 Mo. 322; Railroad v. Fox, 31 Kan. 586; Abel v. Canal Co., 103 N. Y. 581; Bradley v. Railway, 138 Mo. 302; Mathis v. Stock Yards, 135 Mo. 461; Smith v. Baker, L. R. App. Cas. 353; Dayharsh v. Railroad, 103 Mo. 570; Devoe v. Railroad, 174 N. Y. 1; Nellis, Street Railroad Acc. Law, p. 425; Railroad v. Snyder, 68 L. R. A. 183; Doing v. Railroad, 151 N. Y. 582. (2) Respondent argues that plaintiffs cannot recover for the death of their son, because they are aliens. Our Supreme Court has held otherwise, as has also the federal court: Philpot v. Railroad, 85 Mo. 164; Vetelow v. Perkins, 101 Fed. 393; Mulhall v. Faller, 166 U. S. 132; Railroad v. Higgins, 85 Tenn. 620; Railroad v. Mills, 57 Kan. 687; Mayesville v. Marvin, 59 Fed. 91; Stewart v. Railroad, 168 U. S. 445.

*Seddon & Holland* for respondent.

(1) The court did not err in giving a peremptory instruction to the jury at the close of appellants' evidence for the following reasons: Because the appellants are non-resident aliens and cannot, therefore, maintain an action for the death of a person residing in Missouri. Endlich on Interpretation of Statutes, par. 176; Adams v. British Steamship Co., 2 Q. B. 430; Deni v. Railroad, 181 Pa. St. 525; McMillan v. Sawmill Co., 115 Wis. 332; Brannigan v. Union Gold Mining Co., 93 Fed. 164. (2) The court did not err in refusing to allow appellants to prove how many men were employed in respondent's plant, because there was no evidence that the employment in which appellants' son was engaged was complicated or dangerous.

GOODE, J.—This was an action by appellants as the parents of Joseph Gaska, to recover damages for his death alleged to have been due to the negligence of respondent. The deceased had been in the employ of respondent but a short time prior to October 17, 1904, on which date he was the victim of an accident which caused his death. The respondent company conducts, in the southern part of the city of St. Louis, an establishment where railroad cars are repaired. Gaska belonged to a gang of three men whose duty it was to repair the draft timbers of cars. He was engaged in that work late in the afternoon of the date mentioned. A car had been brought into the factory for repairs and the trucks removed from under it. To support it above the floor of the establishment it was set on four trusses or benches, one at each corner. These trusses are described as having three legs, one longer than the others and fitting in a square block or piece at the top. The deceased was under the car at work on the draft timbers near the south end. The rest of his gang were also engaged in similar work about the car and one of them was under

it, as well as himself. While those men were in that position, another gang of men employed in the factory whose duty it was to tighten the truss rods of cars brought in to be repaired, came along and proceeded to tighten the truss rods of the car Gaska was under, not knowing he or any one else was under it and not looking to see. As the car stood on the trusses or supports the truss rods were compressed by the supports at each corner and could not well be tightened. These truss rods are long iron rods running the length of the car and intended to strengthen and support its middle timbers. In order to take the pressure off the truss rods, the crew of men whose business it was to tighten the rods, put a jackscrew under the car about the middle of it, and undertook with this appliance to raise the car off the trusses or supports which stood at the corners. They had raised it two notches on the screw when suddenly the south end of the car fell to the floor, crushing Gaska under it and injuring him so that he died. The testimony is that the jackscrew and one of the trusses at the south end penetrated the bottom of the car and that one of the legs of the truss at the other south corner broke, thereby letting that end of the car onto the floor of the factory. The gang of men who tightened the truss rods in the factory had nothing to do with the work on the draft timbers of cars; that is to say, the gang of which Gaska was a member operated in a distinct sphere of duties from the truss-rod crew. The latter gang would go about from one car to another to fasten the truss-rods and when they were through with one car, would begin work on another. It seems they were under a foreman by the name of Hunter and a subordinate foreman by the name of Sapo. The assignments of negligence are that respondent failed to furnish deceased a reasonably safe place to work, and reasonably safe machinery and appliances to work with, and furnished unsafe machinery and appliances for him

to use; that respondent failed and neglected to adopt, promulgate and enforce adequate rules for the management and conduct of the work done at its establishment, and particularly for the work of fastening truss rods on cars; that respondent failed to provide a sufficient number of foremen to direct the work; that the truss-rods crew was composed of ignorant and unskilled men and respondent failed to provide a foreman for them, or if it provided a foreman, said foreman negligently failed to instruct the men concerning the manner in which their work should be done and the cars jacked up with safety and without risk of dropping or overturning them; that respondent was negligent in permitting cars to be jacked up while they stood on trusses instead of requiring that this be done while their trucks were under them. It was further averred the floor of the factory was defective and gave way while the truss-rods crew tried to jack up the car deceased was working under, and the giving way of the floor caused the truss to slip and the car to fall; that one or more of the trusses (i. e., the benches on which the car rested, and not its truss rods) was of insufficient strength and out of repair and in consequence gave way. It was averred that the death of the appellants' son was the consequence of these acts and omissions of duty on the part of respondent. The answer was a general denial, a plea of contributory negligence on the part of the deceased and that he assumed the risks from which he suffered as incident to his employment. The main facts were testified to substantially as we have stated them and the trial court held them insufficient to take the case to the jury; wherefore a verdict for respondent was ordered and afterwards this appeal was taken.

Appellants complain of the exclusion of a mass of testimony offered by them for the purpose of proving respondent's factory was an extensive and complex

establishment, employing about a thousand men, divided into different gangs having distinct duties, and that respondent had prescribed no rules which would make for the safety of employees during the performance by the different gangs of their respective duties; and particularly for the safety of employees working in the position the deceased was when killed. Appellants' main theory is that respondent had been negligent in failing to prescribe and enforce rules for conducting its complex business which would minimize the hazard incurred by its workmen. The character of the ruling will be made plain by quoting the offer of the excluded testimony and what passed between court and counsel regarding it:

"Mr. Grimm: I want to make myself clear before the court in this matter. I am offering the testimony to show the extent and complex character of the business of this company.

"The Court: I do not think that that would affect the charges in this petition. The issues that are joined here are very narrow. You complain that the deceased was put at work under a certain car which was placed on trusses; that one set of men came to jack it up while the other set of men were at work under the car. I do not see what bearing it has whether there were five hundred or ten thousand men in the shops.

"Mr. Grimm: *It is material whether there were men of different departments coming together and crossing each other in their work and working irrespective of each other's safety, without any rules or regulations.*" (We italicize.)  "The evidence will disclose that the man was at work at the end of the car; that a crew from another department altogether, with which he had no connection and with which he had no relation whatever, went to work and undertook to jack up the car with the men working under it, which was an unsafe and a dangerous thing to do with the man there.

"The Court: *What difference does it make whether there were one thousand or ten thousand men in that factory? Suppose the business is complex, here is a simple transaction as to one car; that is all you are complaining of.* (Italics ours.)

"Mr. Grimm: It is only one car, but there were two different gangs that came together.

"The Court: That you can show, but it is not necessary to show how many men were in the shops to show how many were at work on that car.

"Mr. Grimm: I except to the ruling of the court.

"Q. How many different departments were there in that plant?

"Objected to as immaterial. Objection sustained. To which ruling of the court counsel for the plaintiffs then and there duly excepted. . . .

"Q. What instructions did you receive as to the work your crew was to do and how you were to do it?

"Objected to by defendant. Objection sustained.

"The court directed plaintiffs' counsel to 'come down to some time recently prior to this work.'

"Mr. Grimm: If I give a man instructions now, I suppose they are just as good ten years from now as now. I except to the ruling of the court. . . .

"Q. Did you have any instructions regarding when you should raise a car on a jack?

"Objected to.

"The Court: You had better come down to this case. He might have had instructions five years ago to raise a particular car with a jack and another with a lever; and it would make no difference so far as this case was concerned. It is very difficult to get this testimony from the witness with any kind of certainty. You had better confine yourself to the particular case. . . .

"Q. Who gave these Polish people their instructions? A. Many times I did. I was the only foreman

who spoke Polish. I had been foreman there eight or ten years.

"Q. I will ask you whether your company, during those eight or ten years past, particularly in 1904, in October, had any rule in force directing the crew who worked at the trusses as to when they should raise the cars and when they should not?

"Objected to as irrelevant.

"Mr. Grimm: *I will undertake to find out from this witness whether there was any rule there which would tend to protect men who were set to work at a car from just such acts as this, committed by other men with whom they had no connection. I will undertake to show the whole character of the business. We have found from the witnesses so far, that there were two different crews engaged in different kinds of work, neither of them having anything to do with the other. If your Honor will allow me to go into the whole business I will show it was an extremely complicated thing.*

"The Court: I do not think the testimony is competent. The objection is sustained. To which ruling of the court counsel for plaintiffs' then and there duly excepted."

The extent of the instruction to the truss-rod crew regarding their duties, as testified to by the foreman Sapo, was as follows:

"Q. Had they at any time received general instructions from you as to how they were to do their work, as to when they should go from one car to the other? A. *I told them after they got through with one they had to go to another and truss that; yes, sir.*

"Q. *And truss that?* A. *Yes, sir. That was the only instruction that I know that they had.*"

I. We do not concur in the opinion of the trial court that it was of no moment whether or not the business of the respondent company was a complicated one. The reason the learned judge assigned for his view was

that plaintiffs' case rested on "a single transaction as to one car." Likely in all cases in which an employee is hurt in a factory or in the operation of a railroad, it might be said that the immediate occurrence was, in a sense detached and independent; but nonetheless, by happening in the course of a complicated system of business improperly regulated, it might lay the employer liable. The proposition is supported by all the decisions and treatises that, under certain circumstances, it becomes the duty of an employer to prescribe rules for the conduct of his business according to methods reasonably adapted to insure the safety of his employees. And the chief circumstance on which the duty to do this depends, is that the business is an intricate and complex one in which different workmen or groups of workmen have distinct tasks, and one group in the performance of its tasks, is liable to endanger the safety of some other group engaged in different tasks. [Murphy v. Hughes, 1 Penn. (Del.) 250; Railroad v. Powers, 74 Ill. 341; Eastwood v. Mining Co., 34 N. Y. Supp. 196.] This duty to use ordinary care in regulating the business is a personal non-delegable duty incumbent on the master. [Reagan v. Railroad, 93 Mo. 348, 6 S. W. 371; Shear. & Redf., Neg., sec. 93; 2 Labatt, M. & S., sec. 574, p. 1680 and citations.] To confine the inquiry in this case to the situation and incidents at the time of the accident would leave out of sight facts essential to a correct decision. The court said the issues joined by the pleadings were very narrow. It strikes us that the assignments of negligence are rather broad; but whether this is true or not, they allege failure by respondent to prescribe proper rules for the operations of the workmen in its establishment and, as the petition says, "particularly the work of fastening truss rods on cars in a state of manufacture or repair;" and, again, failure "to direct or instruct said men (the truss-rods

gang) as to how the car could be jacked up with safety and without overthrowing the same." Moreover there is an allegation that respondent maintained and operated a large factory, which points to the magnitude of its business. No point was made against the admission of the excluded evidence on the ground that the allegations of the petition were not broad enough to let it in, and it is apparent that they were broad enough; though we think they might well be made more specific in averments charging that various groups of workmen had separate duties to perform, and that the work of one gang might imperil another; and also in charging negligence in respect of rules to insure the safety of men who might be endangered by the operation of the truss-rods crew. It is fairly inferable from the evidence received that no rule was prescribed for the protection of Gaska and his fellow-workmen. This inference is deducible from the statement of Sapo, the foreman, that he told the truss-rods crew that after they got through with one car they should go to another and truss it and, using his own words, "that was the only instruction that I knew that they had." Obviously this direction to the truss-rods crew was intended to keep them at work, and not designed to protect any other gang of men who happened to be at work on a car whose truss rods they might proceed to tighten. Hence, as far as the evidence reveals, we may say Gaska was unprotected by any regulation against injury from the work of the truss-rods crew. It looks like the car happened to fall on Gaska from the jackscrew, penetrating its floor on account of the great weight on the screw; thereby letting the car drop from the position to which the screw had raised it to the trusses it had previously stood on, when one of them burst through the floor of the car and a leg of the other one broke. The result was that the south end of the car dropped to the floor of the building and pinned Gaska under it. A fellow-workmen of Gaska

by the name of Gwazdacz had been under the car with Gaska but had gone from under it just before the fall. He did this, not because he apprehended danger, but to get some bolts, and swore he had not seen the truss-rods crew come to work on the car until he went from under it. Chuckla, one of the truss-rods crew, did not know Gaska and his coworker were under the car when it was raised by the jackscrew. The effect of the testimony in this connection is that neither crew knew the other was at work on the car. It was, of course, the duty of respondent to use ordinary care for the safety of its employees; and the question right here is whether or not ordinary care required that rules be prescribed reasonably adapted to prevent such an accident as happened. It looks like the occurrence could have been prevented by a rule requiring the truss-rods crew to ascertain before raising a car, whether or not other workmen were under it and if they were, give them warning or refrain from disturbing the car until they were out. Such a rule may not have been essential, and we do not say it was, or that any was; but we are discussing the facts in order to determine whether it was proper to admit the offered evidence in order that the jury might determine from it if some rule to protect the workmen from such accidents was, in common prudence, demanded. They could not determine this matter from the evidence received, because all testimony tending to show the practice, extent and complexity of respondent's business was rejected. It may be that the course of business in the establishment was such that never before, or so infrequently that no duty arose to prescribe rules about it, did a similar situation occur. And possibly the danger to men working under a car from raising it in the manner the truss-rods crew raised the one which fell on Gaska (and that was the regular manner) was but trifling and unforeseeable. But if it was common for one crew of men to go to work on the rods of a car

while another gang was working under it, and the latter were thereby endangered to a degree recognizable by common foresight, we think a jury might reasonably infer that some regulation for the protection of the men under the car against injury from the work of the other gang, should have been issued. The course and complexity of the business and the number of gangs of men at work in the establishment, must be brought into view if this question is to be intelligently answered. It is not a matter of the negligence of the truss-rods crew considered as fellow-servants of Gaska. If regulation by the company of the work of the truss-rods crew was called for, and no reasonable regulation was prescribed, this was a negligent omission of duty by the company. But if reasonable rules were prescribed, and in this instance violated by the truss-rods men, the negligence was not that of the company but of its employees; and perhaps of Gaska's fellow-servants. [Niles v. Railroad, 43 N. Y. Supp. 759, 760; Rose v. Railroad, 58 N. Y. 217; Slater v. Jewett, 85 N. Y. 61.] That the extent and complexity of the operations which an employer conducts, have a bearing and the main bearing, on whether or not, in common prudence, the business should be methodized by rules adapted to prevent the employees from hurting each other in the performance of their respective tasks, is a theory which runs through all the literature of the subject. One text book lays down these words, which were quoted with approval by our Supreme Court in Reagan v. Railroad, 93 Mo. 348:

"A master who employs servants in a dangerous and complicated business is personally bound to prescribe rules sufficient for its orderly and safe management, and to keep his servants informed of these rules, so far as may be needful for their guidance." [1 Shear. & Red., Neg. (5 Ed.), sec. 202.]

In the Reagan case the negligence alleged was fail-

ure of the railroad company to regulate the movement of locomotives and detached cars so as to give the occupants of a car or caboose which happened to be standing on a track, notice of the approach of a locomotive or other cars. Concerning this work the opinion said:

"It is certainly a complex business, requiring care, and must be dangerous, if not done under proper regulations; at least so far as other servants are concerned, whose business requires them to be in and out of the cars, liable to be jolted. In these cases of making a flying switch, and of shunting, or kicking, of cars, it is feasible and perfectly proper to have some rules and regulations to warn persons liable to be injured; and cases are not wanting where railroad companies have been held liable to servants for injuries received in consequence of a want of such regulations for the guidance of the servants in performing these manoeuvers."

In Rutledge v. Railroad, 123 Mo. 121, 132, 24 S. W. 1053, 27 S. W. 327, it was said:

"It is undoubted law in this State that it is the duty of an employer, engaged in so complicated and extensive an undertaking as the operation of a railway, to exercise ordinary care in his method or 'system' of conducting that business. One part of that duty requires the enforcement of reasonable rules or regulations for its control, having due regard for the safety of employees engaged therein."

We find the following statements of the rule in text books:

"When the nature of the business is such as to require it, it is the duty of the master, which the law imposes upon him, as due to his servants engaged therein, to exercise reasonable care and diligence in making and promulgating rules which, if faithfully observed, will give them reasonable protection from injury." [Bailey, Master & Servant, 72.]

"If a master is engaged in a complex business that

requires definite regulations for the safety and protection of his employees, a failure to adopt proper rules, as well as laxity in their enforcement, is negligence *per se*, and the establishment of defective or improper rules is such negligence as renders the master responsible for all injuries resulting therefrom." [Wood, Master & Servant, sec. 403.]

"However experienced and careful servants may be, a master is clearly not justified in conducting a complicated business on a system which assumes them to be capable of selecting, upon each and every occasion, that particular course of action which is the safest both for themselves and for their fellow employees. . . .

"Wherever, therefore, the master should, as a reasonably prudent man, see that there is a probability of injury to some individual servant or to some class of servants, if they and their fellow employees are left to regulate their actions according to their own ideas of what is proper, he is charged with the obligation of protecting them, as far as possible, both by prescribing the lines upon which the ordinary routine of their work shall be conducted, and by declaring what precautions shall be taken by them to minimize the danger arising from special emergencies. The duty upon which the responsibility of the master in this regard is predicated is, therefore, one particular branch of the general duty of the master not to expose his servants to extraordinary dangers." [1 Labatt, Master & Servant, sec. 210.]

The excerpts quoted from the text-writers are fully supported by the adjudged cases; many of which deal with the question of what regulations should be adopted for the protection of car repairers from injury by other gangs of workmen while the former are at work around and under cars. [Railroad v. Cumpston, 15 Tex. Civ. App. 493; Railroad v. Hall, 78 Tex. 657; Abel v. Pres. & Mgrs. of R. R. Co., 103 N. Y. 581, 128 N. Y. 662; Corcoran v. Railroad, 126 N. Y. 673.] Cases where the

person injured or killed was engaged in different lines of duty from car repairing, but in which the same principles and rules of law were declared, are: Larow v. Railroad, 15 N. Y. Supp. 384; Ford v. Railroad, 124 N. Y. 493; Niles v. Railroad, 43 N. Y. Supp. 751, 757; Eastwood v. Mining Co., 34 N. Y. 196; Hartwig v. N. P. L. Co., 19 Ore. 522; Devoe v. Railroad, 174 N. Y. 1; Doing v. Railroad, 151 N. Y. 580. We do not say that in all cases where there are a large number of employees in an establishment, rules must be prescribed regulating the manner in which they shall perform their tasks, for these may be of such a character that the work of one set of men does not endanger any one else. And when the different tasks do imperil workmen otherwise occupied, we do not say that any specific rule must be adopted; at least, unless the evidence shows either that it was necessary, or in general use in well conducted establishments of a similar sort and not covered by some other rule which was in force; and, also, that it would be feasible and efficient. [1 Labatt, secs. 211, 213, and cases cited in note 10, p. 467; Corcoran v. Railroad, 69 N. Y. Supp. 73; Larow v. Railroad, 15 N. Y. Supp. 384.] What we do say is that when the business is complicated, and the operations of the different gangs of workmen entail danger to each other which may be removed or diminished by practicable regulations, it is the duty of the employer to use ordinary care to prescribe such rules. [Authorities supra.] We hold further that, under proper allegations, the character, extent and complexity of the business may be given in evidence on the issues of whether regulations were necessary and reasonable ones had been made; and, in truth, it is incumbent on the plaintiff to make such proof. [Morgan v. Iron Co., 133 N. Y. 666, 670; Berrigan v. Railroad, 131 N. Y. 582, 584; Railroad v. Compston, 15 Tex. Civ. App. 493, 495; Hartwig v. P. L. C. Co., 19 Ore. 522, 525; Railroad v. Carruthers, 56 Kan.

309.] Of course regulations are required to be made only against dangers which the employer, in the exercise of reasonable prudence could have anticipated; for he is no more required to provide by rules against unforeseeable risks, than to provide against them by any other precaution. [Berrigan v. Railroad, supra; Ely v. Railroad, 34 N. Y. Supp. 729; Railroad v. Graham, 96 Va. 430; Sprague v. Railroad, 68 Conn. 345, 37 L. R. A. 638; Whalen v. Railroad, 114 Mich. 512; Morgan v. Ore & Iron Co., 133 N. Y. 666.] And sometimes a business may be so simple and its dangers so obvious to the employees that no rules are necessary. [Stevens v. Charberlin, 100 Fed. 286.] The general theory of the cases is that when one set of men working under the employer are subject to danger while in the performance of their tasks from the operations of another set of men, and this danger can be reasonably anticipated by the employer, and minimized by the use of ordinary care in prescribing rules as to how the two gangs of employees shall work, it is negligence on the part of the employer not to prescribe such rules. [Eastwood v. Mining Co., 34 N. Y. Supp. 196.] The case just cited was one in which the employee was working in a salt bin from which the salt was drawn off by chutes in the bottom; and while he was working there other workmen opened the chutes, in consequence of which he was sucked into one and smothered. It was held that the company should have regulated the opening of the chutes so as to protect workmen who happened to be in them. The court discussed the law of the subject so well that we will quote from the opinion:

"The rule is well settled that it is the duty of all persons and corporations having many men in their employ in the same business to make and promulgate rules, which, if observed, will afford protection to the employees. This is the more necessary where the manner of doing business is such that the danger or safety

of an employee at any given time depends on the way in which some other employee is engaged at the same time. In such a case, where the action of one employee may make that dangerous which, if he took no action, would be safe, it is undoubtedly the duty of the common employer to make such rules as will enable the person whose safety is put at risk to be advised of the danger, and to avoid it. [Abel v. President, etc., 103 N. Y. 581, 9 N. E. 325; Slater v. Jewett, 85 N. Y. 61; McGovern v. Railroad, 123 N. Y. 281, 289, 25 N. E. 373.] To be sure the company is only required to make rules to guard against such accidents and casualties as may reasonably be foreseen, and it is not bound to use more than reasonable care in deciding whether rules are necessary. [Berrigan v. Railroad, 131 N. Y. 582, 30 N. E. 57.] In every case its duty is performed by the exercise of reasonable care in deciding, in the first place, whether rules are necessary, and in the second place, in making such rules as appear to be sufficient. But the question in either case may be for the jury whether, in the first place, the company took reasonable care to conclude whether rules were necessary, or, in the second place, if they were, whether the rules thus made were proper for the purpose for which they were intended. When the question is whether the case was one in which rules ought to have been made, the fact that other people or corporations engaged in the same business had or had not found it necessary to make rules upon that subject, is one which might well be considered. But the fact that no such rules had been made is not conclusive against the necessity of making them. It is simply a fact to be considered. Where the business is complicated, the circumstances are those which do not occur often, and the danger is not serious, it may well be that the fact that other people engaged in the same business have found no necessity for making rules for the particular case may be almost conclusive that such rules

are not necessary. But where the circumstances are such that any person can see what might happen in a given case, and the danger is plain and obvious, the jurors might be at liberty to infer that rules to protect the employee were necessary, although they had no experience in the particular business, and although there was no evidence that other corporations in the same business had made rules for such cases. [Morgan v. Iron Co., 133 N. Y. 666, 31 N. E. 234.] In the case at bar, it is evident that if a man were in the bin at work, standing upon the salt, he might very easily be engulfed so as to be unable to extricate himself, if the chutes below were suddenly opened. Starting from a well-devised set of rules, giving warning to the men who were in the bin, or forbidding the drawing off of salt when any one was in the bin, would conduce greatly to the safety of the men who had occasion to be there. There is nothing in the evidence which would lead the jury to believe that such a rule was impossible, or even difficult, to enforce; and it is quite clear that such a rule might be of great use in insuring the safety of the men who had occasion to be in the bin."

We think that reasoning is very pertinent to the present case, in which one cannot fail to be impressed by the belief that a rule requiring the truss-rods crew to ascertain if other workmen were under a car before raising it would have averted the loss of Gaska's life.

In Hartvig v. N. P. L. Co., 19 Ore. 533, it appeared that the plaintiff was at work at the foot of a lumber chute removing lumber as it descended from the chute and delivering it about a yard. A large stick of timber was passed down the chute without any warning to him, and as it descended it struck a small timber in an adjacent pile of lumber, knocking said timber against him and injuring him. The evidence tended to show that the men working at the foot of the chute were in danger from the descending pieces, and the question

was whether or not the company was remiss in not having a rule requiring warning to be given to them before a timber was sent down the chute. For the company the defense was made that it was the negligence of his fellow-servants—to-wit, the men working at the top of the chute—not to give warning to those at the foot. But the court in a well-considered discussion of the question, held that the conditions under which the work was done were such that it was incumbent on the company to prescribe a rule requiring the workmen at the head of the chute not to start a timber without notifying those at the foot of the chute. As to the distinction beween the negligence of fellow-workmen in omitting a duty and the negligence of a master in not properly regulating his business, see too, Reagan v. Railroad; Niles v. Railroad and Slater v. Jewett, supra. What we have said, will indicate the views we hold on the law of this case. As said, the inference to be drawn from what proof the record contains, is that there was no rule to protect car repairers working under cars from the operations of the rods crew. Whether such a rule was necessary and whether danger to other repairers from the work of the rods men might have been anticipated by the exercise of ordinary care, and whether some rule which would minimize that danger could have been prescribed in the exercise of ordinary care, are all questions which depend largely on the complexity of the operations of the factory, and particularly on the extent and frequency with which, according to the usages of business therein, men working like Gaska under cars, were endangered by the work of the rods crew.

2. It is insisted for respondent that the appellants have no right of action under our statutes because they are non-resident aliens, and cases are cited which support that theory in construing statutes more or less similar to ours. [Adams v. Steamship Co., 2 Q. B. 430;

Deni v. Railroad, 181 Pa. St. 525; McMillan v. Sawmill Co., 115 Wis. 332; Brannigan v. Mining Co., 93 Fed. 164.] The idea of these decisions is that statutes giving a right of action for damages to the next of kin of a deceased person who is killed by the fault of another, like all other statutes, have no extra-territorial force and are not intended for the benefit of any persons except citizens of the State which enacted the law—that the Legislature of said State had no purpose in enacting it to protect the interests of non-resident aliens. But this view has not met with universal acceptance and we think is opposed to the spirit of the adjudication by our Supreme Court in Philpott v. Railroad, 85 Mo. 166, wherein the action was by a husband and wife for damages for the death of their minor son. The plaintiffs were residents and citizens of Texas and this point was raised against their right to maintain the action. In passing on the point the Supreme Court said there was nothing in the statute on which the action was based, which, in the least, indicated a legislative intent to limit the right thereby conferred to residents or persons domiciled in this State; that its provisions were for the benefit of the traveling public and alike for residents and non-residents. It is true that the decision did not involve the fact of an alien resident in a foreign country. But we do not see that this fact introduces a different principle. We cannot presume the Legislature of Missouri was more concerned to confer by legislation rights on citizens of Texas than on citizens of some other country. The essential point is that the statute is general in its terms and ought to be interpreted to confer the right of action on any person, wherever resident, whose kinship to the person deceased is within the terms of the law. That such legislation does apply in favor of non-resident aliens has been decided by respectable courts. [Railroad v. Mills, 57 Kan. 687; Vetaloro v. Perkins, 101 Fed. 393.] The

case last cited goes fully into the question and appears to demonstrate that the cases holding to the contrary, were based on a misconception of what had been decided by the English courts in construing Lord Campbell's Act, a statute similar to the Missouri one. In dealing with the question the Supreme Court of Massachusetts (Mulhall v. Fallon, 176 Mass. 266), said, as an answer to the argument that statutes have no extraterritorial force: "A statute cannot impose duties upon a non-resident alien; it may confer rights upon him." And the right of a non-resident alien to sue on the Massachusetts statute was upheld, as it was also in Kellyville v. Coal Co., 95 Ill. App. 625, a case wherein the mother of a miner killed by negligence in a mine, was permitted to maintain an action for his death on the statute of Illinois, notwithstanding she was a non-resident alien. [See, too, Railroad v. Higgins, 85 Tenn. 620; Stewart v. Railroad, 168 U. S. 445; Railroad v. Glover, 92 Ga. 132.] As between these two discordant lines of decisions we shall adopt for our rule of decision in the present case, the doctrine which seems to us to best accord with the spirit of the Missouri statute under consideration, as interpreted by our Supreme Court, and also most in accord with justice. We hold that the plaintiffs are not disqualified to maintain the action because they are non-resident aliens.

The judgment is reversed and the cause remanded. All concur.